**Kam SANTOS, Plaintiff–Appellant,**

v.

**Daryl GATES; Willie Williams; Bernard Parks; City of Los Angeles; Edith Perez; Jacqueline Boyer, LAPD Sergeant; Kim Allen, LAPD Officer; James Lee, LAPD Officer, Defendants–Appellees.**

No. 00–56114.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 6, 2001.

Filed April 23, 2002.

Stephen Yagman, Yagman, Yagman & Reichmann, Venice, CA, for appellant.

Janet Bogigian, Office of the Los Angeles City Attorney, Los Angeles, CA, for appellees.

Before: REINHARDT and TALLMAN, Circuit Judges, and DAMRELL, District Judge.*

REINHARDT, Circuit Judge.

On December 12, 1997, appellant Kam Santos encountered two Los Angeles Po-

* The Honorable Frank C. Damrell, United States District Judge for the Eastern District of California, sitting by designation.

lice Department (LAPD) officers, Kimberly Allen and James Lee. Shortly thereafter, he was diagnosed with a broken back. Santos brought this action against the officers pursuant to 42 U.S.C. § 1983, alleging that his injury was caused by the police officers' use of excessive force. A three-day trial was held, and at the conclusion of the plaintiff's case-in-chief, the district judge granted judgment as a matter of law in favor of the defendants. The issue on appeal is whether the jury should have been permitted to determine if the police officers were liable for Santos's injury.

## I. BACKGROUND

Kam Santos is a troubled individual who has a long history of psychological problems, difficulties with substance abuse, and brushes with the law. He was diagnosed as a paranoid schizophrenic in 1982. He takes medication to control his mental illness, and he has been hospitalized more than fifteen times for his condition.

### A. Santos's Account of Events

On the morning of December 12, 1997, Santos ate breakfast at the home of his friend Herb, who lived at the William Penn Hotel, located at 8th Street and Alvarado in Los Angeles. Santos ate scrambled eggs and toast, and accompanied his morning meal with approximately a cup and a half of Jack Daniels whiskey. He described himself as "mildly intoxicated" after this breakfast, but stated that he was able to walk. He testified at trial that he had not taken his prescribed medications for approximately seven days before the morning in question. He explained that when he has "a lot of business to take care of," he does not take his medication because it renders him sluggish and he cannot function adequately.[1]

Santos left Herb's residence between 8:00 and 9:15 a.m., and made his way home by bus. Santos had a distinct memory of what bus lines he took and where and why he got off the bus, and also that the weather was clear that day. His recollection of the events from that point onward is less distinct; however, he does remember that two police officers began to pursue him as he proceeded down Arlington Avenue.

Seeing the police caused Santos considerable concern because he had been released from prison just 30 days earlier and had not been reporting to his parole officer as required. Santos had no idea why the police officers were trying to stop him, but he fled on foot until his way was blocked by a chainlink fence that he could not climb because it was topped with barbed wire. Knowing that he was caught, he sank to his knees and interlocked his hands behind his head. Prior experience with the police had taught him that assuming this position would likely "prevent them from do[ing] anything" to him.

The last things that Santos clearly remembers about the incident are seeing the two officers running towards him and hearing a loud sound. He stated that then "[I] felt like my—like my head just blew off. I was in so much pain all I seen was white, white light; and it was—whew, it made me pass out right after I screamed and started yelling, and I passed out." Santos does recall screaming, "Why did[you] have to break my back? I wasn't doing anything. Why did you have to break my back?" and feeling like the lower portion of his body was "on fire" before he passed out. The next thing he remembers was waking up in an ambulance. Santos admits that he has no memory of being struck by the two officers. After the inci-

---

**1.** Santos also testified at trial that he had not taken his medications for the preceding five days because if he had taken them he would have been unable to testify properly.

dent, Santos claims that he was paralyzed below his waist for perhaps two weeks, and that he was forced to wear a back brace and walk with the assistance of a walker for approximately a year.

### B. *The Officers' Account of Events*

The officers' account of the events in question, not surprisingly, differs considerably from Santos's version. LAPD Officers Kimberly Allen and James Lee testified at trial that they were on patrol on December 12, 1997, when they received a radio call that in the area of Arlington Avenue and 27th Street there was a man "screaming and falling down in the street." They found a small cluster of people in front of the house from which the call was made. Those individuals informed the officers that a Latino man who was covered with dirt and was wearing a multi-colored shirt had been roaming the neighborhood screaming. A woman said she thought the man might have taken something from a neighbor's garage. Officer Allen testified that she and her partner considered the individual a suspect because a burglary might have occurred, and a burglary is "a serious felony."

The officers drove around the neighborhood and, on the north side of 27th Street, came across a Hispanic male who was wearing a multi-colored shirt and was walking erratically. He was screaming periodically. The officers initiated an investigative stop. They pulled their patrol car up to the sidewalk where Santos was walking, and both officers got out of the car. Lee approached Santos and told him to stop because they needed to speak with him. Santos stopped walking towards the officers when he was approximately five feet away from them. Lee testified that Santos's behavior throughout their encounter with him was "passive."

Lee's intent was "to take [Santos] into custody until we could determine whether he was the suspect or not and whether we had a crime or not." Lee twice instructed Santos to turn around, place his hands behind his head, and interlace his fingers. Within a few seconds, Santos turned away from the two officers, but dropped his hands to his sides. Because he failed to comply with the entirety of the instructions, Lee stated that "I wasn't going to stand there and ask him all day. I walked up and grabbed both of his wrists to handcuff him." As Lee grabbed Santos's wrists, Santos went limp and slumped to the ground. In order to prevent Santos from hitting his head on the sidewalk, Lee grabbed Santos's arm and shoulder and "guided" him down to the ground. The first part of Santos's body to touch the ground was his buttocks. Allen recalled that during this time, Santos was saying nonsensical things and yelling.

Once Santos was on the ground, Lee rolled him over onto his stomach, handcuffed him, and patted him down for weapons. The officers then sat Santos upright, because Lee thought that otherwise Santos's breathing would be restricted. At this point, the plaintiff began yelling repeatedly, "They're beating me, they're beating me, they're beating me like Rodney King." Santos also began screaming out the officers' names and badge numbers, as if he was attempting to commit them to memory.

The two officers then called for both a supervisor—because of the plaintiff's allegations that he was being beaten—and an ambulance. Before either arrived, Allen asked Santos for his name and address. Santos continued to yell out unintelligible sounds, as well as the officers' badge numbers, and, from time to time, he screamed that he was being beaten. Allen noted that Santos's arms had fresh needle tracks

on them. Within minutes, Sgt. Jacqueline Boyer arrived on the scene. Sgt. Boyer observed Allen propping Santos up while Lee, squatting in front of the plaintiff, was attempting to speak with him. Santos was still yelling, "they're beating me," and Boyer thrice asked him if he was being beaten. He first replied yes, then was non-responsive to her question, and then said no. Boyer never asked Santos if he *had* been beaten. She also testified at trial that because Santos appeared disoriented, she did not believe that when Santos said "they" were beating him, the "they" referred to the two officers. Three eyewitnesses to the events watched from across the street, approximately 25 feet away. Boyer approached and interviewed them, but did not file any report about what they told her they had observed. She spent a total of about fifteen minutes at the scene, and left her business card in Santos's back pocket in case he needed to contact her.

Three paramedics arrived at the location at about the same time as Boyer and took Santos to Midway Hospital. Allen handcuffed each of Santos's arms to a gurney and rode in the ambulance with him to the hospital where she left him in the charge of the medical and security staff. The officers did not investigate the possible burglary any further, because, in Officer Allen's view, Santos did not appear to be sufficiently lucid to have formed the specific intent necessary for the crime of burglary. In fact, no burglary had occurred.

### C. *Medical Evidence*

As a result of Santos's complaints of lower back pain, approximately four hours after he arrived at Midway Hospital an x-ray was taken of his back. It revealed a 10–20% compression fracture of his L–2

vertebra. At the time, Santos's blood alcohol content was .227,[2] and drug tests revealed traces of amphetamines in his system. The emergency room doctor—as well as the defendants' expert witness—described Santos's back injury as "acute," meaning that it had occurred within the last week, and possibly within the past few hours. It is possible, defendants' expert testified on cross-examination, that immobility to the spine could result from this kind of injury, although the defendants' expert doubted that Santos's fractured L–2 vertebra caused him temporary paralysis. There was no visible external sign of the injury, but the emergency room doctor testified that the type of fracture that Santos suffered was not necessarily accompanied by a visible manifestation. A few days later, Santos was sent for physical therapy, and the therapist noted that his gait was "limited" without the use of a walker or a similar assistive device. The defendants' expert witness testified at trial that pain from this type of injury typically lasts three to six weeks, but could end more quickly or last "a lot longer".

### D. *Proceedings Below*

Santos filed this lawsuit on April 26, 1999, against Officers Allen and Lee, as well as against Sgt. Boyer. The plaintiff also named as defendants the City of Los Angeles and a number of high-ranking officials of the LAPD. The complaint contained allegations of unlawful search and seizure, a claim of excessive force, and a claim for municipal liability against the City of Los Angeles under *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The district judge bifurcated the trial: the first stage was the action against the individual officers, and the second was to be

**2.** The defendant's expert testified that it was virtually certain that Santos's blood alcohol content was higher two hours before, when he first encountered the police.

the trial of the Monell claim. At the conclusion of the plaintiff's case in the first stage,[3] the defendants moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a). The district court granted the motion,[4] and we review that decision *de novo*. *See Pierce v. Multnomah Cty.*, 76 F.3d 1032, 1037 (9th Cir. 1996).

## II. DISCUSSION

### A. *The Evidence Gives Rise to Material Questions of Fact.*

Judgment as a matter of law is appropriate when the evidence presented at trial permits only one reasonable conclusion. *See LaLonde v. County of Riverside*, 204 F.3d 947, 959 (9th Cir.2000). "If conflicting inferences may be drawn from the facts, then the case must go to the jury." *Pierce*, 76 F.3d at 1037 (quoting *Rutherford v. City of Berkeley*, 780 F.2d 1444, 1448 (9th Cir.1986)). To uphold the district judge's directed verdict in favor of the defendants, we must find that no reasonable inferences could support a verdict for the plaintiff.

The district court granted judgment as a matter of law in favor of the defendants primarily because of Santos's testimony that he did not specifically remember being forced to the ground by defendant Lee. It decided that this single statement compelled the conclusion that there was insufficient evidence of excessive force in the record. In fact, however, there was more than enough evidence from which the jury might reasonably have found liability on the part of the defendants.[5] *See Acosta v. City and County of San Francisco*, 83 F.3d 1143, 1148 (9th Cir.1996) (regardless of a district judge's view as to any particular factual dispute, the judge must always address "the dispositive issue: whether the evidence, viewed most favorably to the [plaintiff], permitted a conclusion" in the plaintiff's favor).

Simply because Santos has no clear recollection of the act which he contends caused his severe injury does not mean that his claim must fail as a matter of law. In *Ting v. United States*, 927 F.2d 1504, 1508 (9th Cir.1991), the plaintiff—who, like Santos, was a "paranoid and unstable" individual—suffered from traumatic retrograde amnesia and was unable to recall being shot by the defendant FBI officers. The disputed evidence consisted of testimony from the officers as to how and why they shot Ting on the one hand, and the possibly inconsistent nature of Ting's injuries on the other. *See id.* at 1510. There, we held that if the version of the shooting favorable to Ting is believed, the trier of fact could reasonably find that the officers used excessive force against him, eventhough Ting, himself, had no recollection of the events that caused his injuries. *Id.* The same is true here. Santos does not recall the precise acts engaged in by the LAPD officers. Yet, before he encountered Officers Allen and Lee, Santos was

---

**3.** The plaintiff called all three officers as part of his case-in-chief. For logistical reasons some of the defense's medical witnesses also testified before the plaintiff rested. Thus, by the time the plaintiff completed his presentation, a substantial amount of the defense evidence had also been admitted.

**4.** Although at trial the plaintiff advanced three Fourth Amendment claims—one for an unreasonable seizure, a second for an unrea-

sonable search, and a third for excessive force—on appeal he pursues only the third.

**5.** The high-ranking officer defendants and the City of Los Angeles made no separate arguments in the district court and make none on appeal. For present purposes, they rest solely on the arguments regarding the liability of the officers on the scene.

able to walk. The officers admit to taking him to the ground and then handcuffing him even though Officer Lee characterized him as "passive." Although plaintiff does not remember observing the officers using any force, the officers acknowledge that they forcibly immobilized him. During the course of his encounter with the officers, Santos experienced extreme pain in his back, as evidenced by his shouts of "why did you have to break my back?" The defendants' expert witness testified at trial that Santos's injuries could have been inflicted on the day he encountered the officers, and that the injuries could also be consistent with his having been violently shoved to the ground. The medical evidence indicates that Santos's mobility was affected for some time after the incident.

■ Thus, just as in *Ting,* a jury could well draw reasonable inferences from the circumstantial evidence presented that would support a verdict for the plaintiff. Nowhere in our cases have we held that police misconduct may be proved only through direct evidence. To the contrary, a jury's finding for a plaintiff in an excessive force case may unquestionably rest on inferences drawn from circumstantial evidence. For example, in *Rutherford v. Berkeley,* 780 F.2d 1444, 1448 (9th Cir. 1986), we held that even though the plaintiff could not recall whether the three defendant officers were among the officers who had beaten him, because they were among the five or six officers who surrounded him while he was being attacked,

a jury could reasonably find that they participated in the assault.[6] Indeed, as is the case in the appeal before us, excessive force claims typically boil down to an evaluation of the various accounts of the same events. Thus, the circumstances surrounding those events may be critical to a jury's determination of where the truth lies.

Whether or not the evidence in the record establishes liability on the part of the defendants depends on the resolution of disputed questions of fact and determinations of credibility, as well as on the drawing of inferences, all of which are manifestly the province of a jury. *United States v. Goode,* 814 F.2d 1353, 1355 (9th Cir.1987). Here, the officers admit to having applied force when restraining Santos. A jury might find believable the officers' contentions that they did so gently, and accordingly might return a verdict in their favor. Alternatively, a jury might find the officers' testimony that they were restrained in their use of force not credible, and draw the inference from the medical and other circumstantial evidence that the plaintiff's injuries were inflicted on him by the officers' use of excessive force. After all, broken backs do not ordinarily result from the type of gentle treatment described by Officer Lee. The district court thus erred in concluding that Santos's inability to recall the precise manner in which his injury occurred necessitated judgment for the defendants.[7]

6. Although *Rutherford* is in some respects no longer good law because it analyzed the excessive force claim under the substantive due process rubric that was supplanted by the Fourth Amendment approach set forth in *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the directed verdict analysis is still binding precedent.

7. The dissent appears to be under the impression that a jury must always choose to believe

in its entirety either the evidence presented by the plaintiff or the evidence presented by the defendant. To the contrary, life—and jury trials—is seldom so black and white. Here, a jury question results from the existence of testimony presented by both sides as to how various events occurred, as well as from the circumstantial evidence that could give rise to differing inferences. The reason why judgment as a matter of law was improper in this case may be summarized in a nutshell: San-

**B.** *The Evidence Viewed in the Light Most Favorable to Plaintiff Could Properly Support a Finding of Excessive Force.*

The defendants contend that, even if a jury were to find as a matter of fact that they broke Santos's back, as a matter of law they cannot be held responsible, because their use of force was objectively reasonable under the circumstances and, thus, was not excessive. Their contention, however, necessitates the resolution of disputed facts and the drawing of inferences, all of which must, for purposes of this appeal, be made in Santos's favor. *La-Londe,* 204 F.3d at 959.

 We hold that in this case, when the disputed facts and inferences are treated in the manner required by law, a jury could properly find a Fourth Amendment violation. A Fourth Amendment claim of excessive force is analyzed under the framework set forth by the Supreme Court in *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). That analysis requires balancing the "nature and quality of the intrusion" on a person's liberty with the "countervailing governmental interests at stake" to determine whether the use of force was objectively reasonable under the circumstances. *Id.* at 396, 109 S.Ct. 1865. Determining whether a police officer's use of force was reasonable or excessive therefore "requires careful attention to the facts and circumstances of each particular case" and a "careful balancing" of an individual's lib-erty with the government's interest in the application of force. *Id.; see Deorle v. Rutherford,* 272 F.3d 1272, 1279–81 (9th Cir.2001). Because such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly. *See, e.g., Liston v. County of Riverside,* 120 F.3d 965, 976 n. 10 (citing several cases). This is because police misconduct cases almost always turn on a jury's credibility determinations. This case is no different.

 Although it is undoubtedly true that police officers "are often forced to make split-second judgments," and that therefore "not every push or shove, even if it may seem unnecessary in the peace of a judge's chambers" is a violation of the Fourth Amendment, *id.* (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir. 1973)), it is equally true that even where some force is justified, the amount actually used may be excessive. *P.B. v. Koch,* 96 F.3d 1298, 1303–04 (9th Cir.1996). Here, applying the *Graham* analysis, a jury could reasonably conclude that there was little or no need for the application of force against Santos, and that in light of his serious injury, the force used was both substantial and excessive.

On the one hand, the nature of the intrusion was quite severe: as a result of being taken to the ground, Santos suffered a broken vertebra which caused him both

---

tos was walking unassisted prior to encountering the officers. He remained "passive" throughout the encounter. The officers admit that they took him to the ground, although they contend that they did so gently. Immediately thereafter, Santos yelled, "why did you have to break my back?" He was then taken to the hospital and diagnosed with a broken vertebra that caused his mobility to be limited. These events and circumstances, and the inferences that can be drawn from them, clearly raise a question of material fact as to whether the officers used excessive force and whether Santos suffered serious injury as a result. If a jury ultimately finds that Santos's injuries were caused by the officers' use of excessive force, there will in all likelihood be no basis for qualified immunity under *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). *See* n. 12, *infra.*

pain and immobility. The consequences of his injury endured for a significant period of time.[8] On the other hand, none of the three countervailing *Graham* factors supports much—if any—governmental interest in using the degree of force against Santos that may have been involved.[9] First, the crime at issue was not at all serious. At most, Santos appeared guilty of public intoxication. Evidence of an alleged robbery was minimal and entirely speculative; a neighbor stated that the man wandering around the neighborhood "may have" taken something out of an open garage, although the police did not know what he was alleged to have taken or even where the garage was. Second, the officers admitted that Santos did not pose a significant or immediate safety risk. Officer Lee described Santos's manner when they encountered him on the sidewalk as "passive." Third, there is no evidence that Santos actively resisted arrest; under any account of the events he did not struggle with the officers but in fact evinced a willingness to submit to their assertions of authority. The arresting officer complained only that instead of placing his hands on top of his head when he turned around, Santos dropped his hands to his sides.

Defendants contend that merely assisting Santos to the ground cannot be considered excessive force, because the take-down was not a sufficiently intrusive physical act. Assuming without deciding that some action on the part of the officers was warranted, the question remains whether the take-down was accomplished by the use of excessive force. Force is excessive when it is greater than is reasonable under the circumstances. *Graham*, 490 U.S. at 395, 109 S.Ct. 1865. We have held, for example, that the overly tight application of handcuffs can, depending on the circumstances, constitute a violation of the Fourth Amendment. *See, e.g. Palmer v. Sanderson*, 9 F.3d 1433, 1436 (9th Cir. 1993). Here, the jury must determine not only whether the officers were justified in using force at all, but, if so, whether the degree of force actually used was reasonable. We cannot say as a matter of law that a jury could not conclude that taking a passive individual to the ground with force sufficient to break his back was excessive.

Our recent decision in *Jackson v. City of Bremerton*, 268 F.3d 646 (9th Cir.2001), does not, contrary to defendants' assertions, require that we affirm the district court here. In *Jackson*, the plaintiff alleged the use of force that was in some respects similar to the force applied to Santos,[10] and we concluded as a matter of law that the plaintiff did not allege a violation of the Fourth Amendment. However, the *circumstances* surrounding the use of force in *Jackson*, as well as the *extent* of the force applied by the officers in that case, differ significantly from the events

---

**8.** We note again, out of an excess of caution, that we make no finding as to causality here. We merely state that, on the record before us, a jury could reasonably do so.

**9.** In *Graham*, the Supreme Court directed that when weighing the extent of force used against the need for force, the latter should be examined in light of the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396, 109 S.Ct. 1865.

**10.** In *Jackson*, the officers allegedly pushed to the ground a plaintiff who was already in a kneeling position. The officers broke Jackson's fifth finger "during what she admits was a normal handcuffing procedure," and subsequently placed her in a locked police car and rolled up the windows, although her hair had previously been sprayed with a chemical substance. *Id.* at 650, 652, 109 S.Ct. 1865.

that occurred here. In *Jackson*, six officers faced a group of thirty to fifty citizens who refused to obey the officers' commands to disperse. *Id.* at 652–53. The plaintiff in *Jackson* described the scene as a "melee." *Id.* Physical encounters were taking place between police officers and members of the group of which the plaintiff was a part. The plaintiff attempted to interfere with an arrest the officers were trying to make. All of this stands in stark contrast to the circumstances under which Lee and Allen apprehended Santos. In the present case, two officers encountered one person who they had been told was behaving in an emotionally or mentally disturbed manner. When they encountered him, Santos's response was, according to Officer Lee, "passive." Thus, the governmental interest in the application of force was significantly less here than in *Jackson*.

Moreover, in *Jackson* the injuries sustained by the plaintiff were far less severe than those inflicted here: Ms. Jackson suffered a broken fifth finger and the discomfort that occurred when a chemical solution that was sprayed on her hair ran into her eyes; as to the latter, the officers applied water within minutes in order to alleviate the discomfort. We described the intrusions, i.e., the injuries, in *Jackson* as

"minimal." *Id.* at 653. Under no circumstances would we describe a broken back in that manner. Although in *Jackson* we appear to have conflated the injury and the degree of force employed, our reasoning appears to have been that because the injuries were so minor, the force used must have been minor also. *See* 268 F.3d at 652.[11] Although such a form of deductive reasoning may be appropriate in some use-of-force cases, in others the intrusion may be substantial even though the injuries are minor. *See Robinson v. Solano Cty.*, 278 F.3d 1007, 1015 (9th Cir.2002) (en banc). Moreover, particularly in cases in which the plaintiff was not forcibly resisting, the severity of the injuries may support the inference that the force used was substantial. Here, a jury could reasonably draw the inference that the use of force sufficient to break Santos's back was far more intrusive—i.e., far greater—than the force used in *Jackson*, and was excessive.

In light of the factual disputes regarding the amount of force used, the circumstances under which it was applied, and the extent of the plaintiffs' injuries, the question is properly for the jury whether the force applied by the officers was objectively reasonable under the totality of the circumstances.[12]

**11.** In *Jackson* we also appear to have conflated whether a constitutional violation occurred with whether a qualified immunity defense exists. *See* 268 F.3d at 652, n. 3. To the extent that we may have raised a question as to whether *Headwaters Forest Defense v. County of Humboldt*, 211 F.3d 1121 (9th Cir. 2000) ("*Headwaters I*"), amended by, 240 F.3d 1185, cert. granted, vacated and remanded, ——— U.S. ———, 122 S.Ct. 24, 151 L.Ed.2d 1 (2001), remains good law with respect to the first issue, the answer is that it does. *See Headwaters Forest Defense v. County of Humboldt*, 276 F.3d 1125, 1127 n. 2 (9th Cir.2002) ("*Headwaters II*"). *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), is not relevant to that question, but only to the issue of qualified immunity.

*See* n. 11, *infra*. As to the latter issue, we also resolved that question subsequently in *Headwaters II*, 276 F.3d at 1129–31.

**12.** In *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court set forth a two-part test for qualified immunity in excessive force cases. First, we examine whether a Fourth Amendment violation occurred; second, we look to see whether the officers violated clearly established law. The issue of qualified immunity was not raised in the Rule 50(a) motion in the trial court or in the parties' briefs on appeal. However, at the request of one of our members, the panel requested, *sua sponte*, that the parties be prepared to discuss the issue at oral argument and they did so. We therefore

## III. CONCLUSION

Because the evaluation of Santos's claim depends principally on credibility determinations and the drawing of factual inferences from circumstantial evidence, both of which are the traditional functions of the jury, a question of material fact exists with respect to the amount of force used by the officers. Additionally, "[b]ecause questions of reasonableness are not well-suited to precise legal determination," *Chew v. Gates,* 27 F.3d 1432, 1440 (9th Cir.1994), the jury must be allowed to assess whether the force used by the officers was excessive. We therefore reverse the order granting judgment for defendants and remand for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

TALLMAN, Circuit Judge, dissenting.

With all due sympathy for Mr. Santos and his mysterious injury, I respectfully dissent from the Court's opinion and its failure to abide by the latest pronouncements of the Supreme Court on use of force cases involving police officers.

The Supreme Court tells us that "[i]n a suit against an officer for an alleged violation of a constitutional right, the requisites of a qualified immunity defense must be considered in proper sequence." *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The trial court should make a ruling on immunity "early in the proceedings" because qualified immunity is "an *immunity from suit* rather than a mere defense to liability." *Id.* at 200–01, 121 S.Ct. 2151 (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)) (emphasis in original). The initial inquiry is whether the facts alleged in the light most favorable to the plaintiff demonstrate that the officers violated a constitutional right. *Id.* at 201, 121 S.Ct. 2151. If no constitutional right has been abridged, the inquiry ends. Only "if a violation could be made out on a favorable view of the parties' submissions" does the trial court ask whether the right was clearly established. *Id.*

The first step in our analysis, then, is to determine whether the facts alleged indicate that the officers actually violated a constitutional right. Though not presented with the issue of qualified immunity because the case was tried before the Supreme Court's decision, the trial court's directed verdict was certainly consistent with *Saucier.* The lesson we glean from *Saucier* is that district courts should be more active in terminating litigation as early as possible so that officers who are protected by qualified immunity do not have to sit through an entire jury trial when there is no evidence that they committed a constitutional violation.

Here, the trial court granted defendants' motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a) after listening to all of the plaintiff's evidence. The directed verdict was proper because "there[was] no legally sufficient evidentiary basis for a reason-

have the authority to decide that issue. Nevertheless, it is premature to do so at this time, because whether the officers may be said to have made a "reasonable mistake" of fact or law, *Katz,* 533 U.S. at 205, 121 S.Ct. 2151, may depend on the jury's resolution of disputed facts and the inferences it draws therefrom. Until the jury makes those decisions, we cannot know, for example, how much force was used, and, thus, whether a reason-

able officer could have mistakenly believed that the use of that degree of force was lawful. While it does not affect our analysis, we should reiterate that contrary to the analytical structure stated to be applicable at the outset of the dissent, the appeal as presented by the defendants raises only the pure excessive force issue and not a qualified immunity claim.

able jury to find" that the officers had used excessive force upon Mr. Santos. Fed.R.Civ.P. 50(a). Santos could not recollect the police officers ever touching him and did not provide any evidence that the police used unreasonable force upon him.

My colleagues try to frame this case as one raising questions of credibility so as to justify sending it to the jury, Slip Op. at 852, but in their effort to make the case that Santos did not, they fail to follow Rule 50(a)'s requirement that there must be a "legally sufficient evidentiary basis" for a "reasonable jury" to find in favor of Santos. Tellingly, the Court's opinion attempts to piece together selective versions of two widely different accounts of two different events—one from Santos and one from the officers—but ignores the fatal flaw in plaintiff's proof that the versions basically represent two different cases. According to Santos, he was running away from the police in an alley; according to the officers, Santos was walking on the sidewalk; according to Santos, he tried to climb a fence; according to the officers, there was no fence; according to Santos, he screamed, "why did [you] have to break my back?;" according to the officers, Santos screamed, "they're beating me like Rodney King," when no such activity was occurring.

If this were really a case about credibility, the jury would be asked to choose whether to believe Santos's account of the same event or the officers'.[1] Cases that turn on credibility are those where the issue of causation is properly joined on the same basic factual predicate leading to the plaintiff's injury—one party says one thing happened during the arrest and the other side says something else occurred. That's not this case. Santos's evidence primarily consisted of the *officers'* testimony, and Santos provided no evidence that directly challenged their testimony. Instead, the Court on its own seeks to piece together parts of Santos's account,[2] parts of the officers' account,[3] and adds to that its own speculation of how the injury might have happened,[4] then calls this a case of circumstantial evidence that only a jury can resolve.

While the Court may be right that "excessive force claims typically boil down to an evaluation of the various accounts of the same events," Slip Op. at 852, that, again, is not this case. The parties did not describe the same event. The officers told one story, a story that corroborating evidence supports (at least as to the place of the encounter). Santos told another story occurring at another place that involved an alley, a fence, and some unidentified people. Moreover, there is no dispute that Mr. Santos was not taking his psychotropic medications, was behaving in a manner consistent with paranoid schizophrenia exacerbated by a substantial amount of straight bourbon whiskey, and was screaming in broad daylight when neighbors called for help. The trial judge heard all of the plaintiff's evidence and properly

---

1. While in some cases it may be possible that parts of both parties' version are true and parts untrue, this is not the case when the versions stand in such stark contrast to one another so as to describe completely different events. It was for that reason that after listening to the evidence presented the district court properly granted the Rule 50 dismissal.

2. Such as his shouting "why did you have to break my back?" Slip Op. at 852.

3. Such as their description of Santos being "passive," Slip Op. at 852, and their admission of having applied limited force to calm and restrain Santos. Slip Op. at 852.

4. Such as the majority's questioning whether the officers *gently* applied force. Slip Op. at 852.

ruled he had failed to establish a prima facie case of excessive force that produced a back injury caused by the defendant officers during his arrest. Since no reasonable jury could find for the plaintiff based on Santos's version of the facts, Rule 50(a) mandated dismissal.

The cases cited by the Court do not preclude judgment as a matter of law in this case. In *Ting v. United States*, 927 F.2d 1504 (9th Cir.1991), even though Ting was "paranoid and unstable" and suffered from "traumatic retrograde amnesia" so that he was "unable to recall the events of the shooting," the facts clearly established that Ting was shot in the back during an FBI SWAT team raid of his home. *Id.* at 1508. The genuine issue of material fact was whether Ting "was shot at close range while in a prone position or on his hands and knees," *id.* at 1510, or whether Ting was shot while upright from a distance of "four or five feet," as the officer who shot Ting claimed. *Id.* at 1508. Though Ting could not testify to it, a ballistics expert could opine that "the gun was aimed and shot horizontally or downward from skin contact up to eighteen to twenty-four inches away." *Id.* at 1510. Thus, *Ting*, unlike the case before the Court, presented a question of credibility.

In *Ting*, there was no dispute that the agent shot Ting or that it was the shooting that injured Ting. In the case before us, however, there is no evidence that Officer Lee used the amount of force that would be required to break someone's back, nor is there evidence that Santos's broken back stemmed from his arrest. Furthermore, Ting did not undermine his own case by stating something like he was shot in a field while running from police. Santos, on the other hand, stated he was in an alley by a fence when he was injured. Thus, while *Ting* presented one clear story posing a definite unresolved question for a trier of fact, Santos does not challenge the specifics of the officers' account of what happened but rather claims his injury took place in a completely different locale under completely different circumstances with no corroborating evidence to sustain his claim.

*Rutherford v. Berkeley*, 780 F.2d 1444 (9th Cir.1986), does not aid Santos either. That case merely stands for the proposition that if a group of officers simultaneously beats an individual, this Court will not require the plaintiff—who is presumably covering up in an effort to avoid the blows—to specifically identify which members of the assaulting team threw the punches. As long as the plaintiff identifies the defendants as part of the group that assaulted him, we leave it to a jury to determine whether or not particular defendants engaged in the beating. *See id.* at 1448.

Thus, had Santos alleged that he suffered a broken back after a group of officers surrounded him and beat him, but he could not remember which ones actually took part in the beating, I would agree that the question was one for a jury to decide. In this case, however, Santos did not provide any evidence that the officers used excessive force upon him because he cannot say where he actually sustained the injury and the medical testimony acknowledged that it could have happened hours or days before his arrest.

Whether or not anyone knows exactly how Santos happened to break his back, the district court properly granted judgment as a matter of law for the defendants based on this evidentiary record. The approach of the majority—"to deny [judgment as a matter of law] any time a material issue of fact remains on the excessive force claim—could undermine the goal of qualified immunity to 'avoid excessive disruption of government and permit the res-

olution of many insubstantial claims [by way of judgment as a matter of law].'" *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151 (citation omitted); *see also id.* at 212 n. 3, 121 S.Ct. 2151 (Ginsburg, J., concurring) ("disputed versions of the facts alone are not enough to warrant denial of [judgment as a matter of law]") (quoting *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir.1994)).[5]

Because Santos failed to establish a prima facie case to send his claims to a jury, that should be the end of the inquiry. *See Jackson v. City of Bremerton*, 268 F.3d 646 (9th Cir.2001). Because the Court finds judgment as a matter of law inappropriate, however, it proceeds to conclude that a jury could have found a Fourth Amendment violation. *See* Slip Op. at 853. Again, I disagree.

Under *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1986), we determine whether the particular use of force was objectively reasonable under the circumstances by balancing the "nature and quality of the intrusion" on an individual's liberty against the "countervailing governmental interests at stake." *Id.* at 396, 109 S.Ct. 1865 (citations omitted). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* Here, officers were responding to an unknown trouble call involving a mentally unstable individual who had been trying to open fence gates and metal screen doors, causing a disturbance, and possibly engaging in burglary or other crimes. Controlling the agitated suspect in order to begin their investigation was prudent and a ne-

cessity for the safety of the officers and the public at large.

When evaluating the "nature and quality of the intrusion" we consider "the type and amount of force inflicted." *City of Bremerton*, 268 F.3d at 651–52 (quoting *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir.1994)). The Court apparently presumes because of the significance of the injury that the officers used "substantial and excessive" force. Slip Op. at 853. This does not necessarily follow. A police officer could approach a home intruder from behind, for example, and clasp a hand on the intruder's shoulder, whereupon the intruder's knees buckle and he falls and breaks his leg. In such a case, the "nature and quality of the intrusion" would have been minimal despite a fairly significant injury. In this case, the officers stated they gently applied force to calm Santos down and place him in restraints; this testimony went unchallenged.

The Court also dismisses the countervailing government interests too easily. Santos was not your ordinary drunkard. His mid-day blood alcohol content was an astronomical .227 two hours after first encountering police, he had traces of amphetamines in his system, and he was a paranoid schizophrenic who for several days had skipped taking the medicine to control his mental illness. The officers had received a report of a man "screaming and falling down in the street" who was covered in dirt and who was a burglary suspect. Santos failed to comply with the officers' directives to place his hands on top of his head.[6] Thus, the officers were facing a potentially violent felony suspect

---

**5.** The quotations come from summary judgment cases. Here, Santos had the opportunity to present his complete case-in-chief at trial. The trial court was therefore "freer to direct a verdict" because the court had a "better basis on which to determine the exis-

tence of material issues." *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 772 (9th Cir.1981).

**6.** Santos claims he did do this, but he also claims he was in an alley near a fence.

who was delusional,[7] acting irrationally, and not following orders. Some force was definitely reasonable to effect his arrest under the circumstances. The officers stated they gently applied force while handcuffing. Santos and guiding him to the ground. The only evidence to challenge this account was Santos's injury and there is *no evidence* that he actually sustained it at the time of his arrest. It is therefore clear, based on the plaintiff's case-in-chief, that the amount of force used to arrest Santos was objectively reasonable under the circumstances and that no constitutional violation occurred.

Because Santos did not offer sufficient competent evidence to support a reasonable jury's finding of excessive force employed during his arrest, judgment as a matter of law was appropriate. I would therefore affirm the district court and respectfully dissent from the Court's opinion.

**7.** Even if Santos was "passive" for a while, his excessively inebriated state coupled with his mental condition would mean his demeanor or could change rapidly, as evidenced by his subsequent screaming and irrational behavior.