Thomas R. WILKEY, Jr.,
Plaintiff–Appellant,

v.

John ARGO, Defendant–Appellee.

No. 01–5515.

United States Court of Appeals,
Sixth Circuit.

Aug. 13, 2002.

Before SUHRHEINRICH, SILER, and GILMAN, Circuit Judges.

OPINION

GILMAN, Circuit Judge.

Thomas R. Wilkey, Jr. claims that John Argo, a Dayton, Tennessee police officer, used excessive force against him. The district court granted Argo's motion for summary judgment, concluding as a matter of law that the degree of force that Argo used against Wilkey was objectively reasonable under the circumstances of their encounter. For the reasons set forth below, we **REVERSE** the judgment of the

district court and **REMAND** the case for further proceedings consistent with this opinion.

## I.  BACKGROUND

### A.  Factual background

Wilkey's encounter with Argo has its origin in a domestic dispute. On the evening of Saturday, January 23, 1999, Wilkey, who had been drinking, insisted that his wife Debra drive him from their house in rural Rhea County, Tennessee to a fast-food restaurant located about 30 miles away. Debra acquiesced to his demands after arguing with him for approximately ten minutes.

On their return drive, Wilkey instructed Debra to stop the car, at which point he removed a gun from the car's glove compartment and fired it into the air several times. The couple returned to their house without further incident. But once they arrived home, Debra heard her husband firing a gun near their garage while she was getting ready for bed.

After the shooting stopped, a Rhea County deputy sheriff, Ralph Dillard, arrived at the Wilkeys' house to investigate the gunshots. Debra told Dillard that her husband had been shooting a gun, was intoxicated, needed assistance, and should be taken to jail. Dillard, who had worked with Wilkey during Wilkey's former employment as a Rhea County deputy sheriff, told Debra that he could not do that to "his ole' buddy," and apparently took no action other than talking with Wilkey.

The next morning Debra went to the Rhea County Hospital, where she worked as a paramedic. Because she did not want to speak with or see Wilkey, Debra told the receptionist not to let Wilkey into the hospital if he came to visit. Debra then called Wilkey's father and told him about her husband's behavior the previous evening.

Later that morning, Wilkey called Debra at the hospital. Wilkey asked her why she had called his father, and told Debra that her conversation was "worrying his parents to death." Debra told her husband that she was not trying to upset his parents, at which point Wilkey stated that "maybe someone needs to show you how it feels." He also told Debra that he intended to drive to the hospital to see her.

Following her conversation with Wilkey, Debra called the Rhea County central dispatch to inform the police that her husband was on his way to the hospital, and that he might be carrying a gun behind his back or between the seats of his truck. Debra then exited the hospital. Before leaving the hospital's parking lot, she met Argo, who inquired about her report to the dispatch office. She told Argo about her argument with Wilkey and warned him that her husband might be carrying a gun.

Argo left the hospital to get lunch after his conversation with Debra. During his lunch, Argo received a report that Wilkey had arrived at the hospital. Argo asked Bill Cranfield, a police officer with whom he was eating, to meet him at the hospital. He then left to investigate Wilkey's presence.

Prior to Argo's arrival at the hospital, Wilkey had asked the hospital's receptionist if he could speak to his wife. Both the receptionist and another hospital employee told him that Debra was busy and did not want to speak with him. Wilkey then exited the hospital without incident.

When Argo arrived at the hospital, Wilkey was walking toward his truck in the parking lot. Argo asked Wilkey to stop walking so that he could ask Wilkey a few questions. Wilkey slowed his pace but did not stop, telling Argo that they did not

need to talk, that he was on his way home, and that he had not done anything wrong. At that point, Cranfield arrived at the scene, which caused Wilkey to stop walking.

Argo informed Wilkey that he was investigating an official call and that he had been advised that Wilkey was present at the hospital "to cause trouble" and would probably be carrying a gun. Wilkey told Argo that he did not have a gun with him, but that he had one in his truck. Argo then asked if he could "pat down" Wilkey, and Wilkey consented.

Although the frisk did not reveal a gun, Argo felt an object in Wilkey's back pocket that aroused his suspicion. Argo asked Wilkey what the object was. Rather than telling Argo that it was a six or seven-inch-long stinger flashlight, Wilkey removed the object from his pocket and displayed it for a few seconds. Argo then accused Wilkey of carrying an ASP baton, an expandable nightstick that can be used as a weapon. Wilkey did not directly respond to Argo's comment, but instead placed the flashlight back into his pocket and informed Argo that he had a right to carry it. At no time did Wilkey threaten Argo with the flashlight.

Argo then reached around Wilkey to remove the object from his pocket. According to Argo, Wilkey pushed Argo's hand away. Wilkey, in contrast, denies doing so. Argo proceeded to grab Wilkey by the shirt and collar and spin him around onto Cranfield's Jeep, which was about six to eight feet behind them. Wilkey claims that Argo then climbed on the Jeep and forced Wilkey's head, neck, and shoulders against the hood. Argo pinned Wilkey on the hood by placing his forearm under Wilkey's chin. While Wilkey was restrained in this manner, Argo told him to go home, calm down, and work things out with his wife. After about 20 seconds, Argo released Wilkey and allowed him to leave.

Wilkey eventually received medical treatment for the back pains that he experienced following his encounter with Argo. He was diagnosed with two ruptured disks in his spine.

## B.  Procedural background

This lawsuit was filed in the United States District Court for the Eastern District of Tennessee in January of 2000. Wilkey asserts claims under 42 U.S.C. §§ 1983 and 1988 for violations of his First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights. More specifically, the complaint alleges that Argo, who was sued in his individual and official capacities, used excessive force against Wilkey.

Argo filed a motion for summary judgment, arguing that the degree of force that was used against Wilkey was objectively reasonable under the circumstances and, in the alternative, that Argo was entitled to qualified immunity. The district court granted Argo's motion for summary judgment, concluding that no reasonable juror would find that Argo used excessive force against Wilkey. This timely appeal followed.

## II.  ANALYSIS

### A.  Standard of review

A district court's grant of summary judgment is reviewed de novo. *Holloway v. Brush,* 220 F.3d 767, 772 (6th Cir.2000). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering such a motion, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it. is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## B. Excessive force claim

Wilkey brings this lawsuit pursuant to 42 U.S.C. § 1983. He must therefore establish "that (1) a person, (2) acting under color of state law, (3) deprived [him] of a federal right." *Berger v. City of Mayfield Heights*, 265 F.3d 399, 405 (6th Cir.2001) (setting forth the requirements of a § 1983 claim). The sole issue in the present case is whether Argo violated any of Wilkey's federal rights.

■ Wilkey alleges that Argo violated the Fourth Amendment by using excessive force when he pinned Wilkey against the hood of Officer Cranfield's Jeep and restrained him there. Argo concedes that his actions constituted a "seizure" for purposes of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 395 n. 10, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (explaining that "[a] seizure triggering the Fourth Amendment's protections occurs only when government actors have, by means of physical force or show of authority, ... in some way restrained the liberty of a citizen") (internal quotation marks omitted). As a result, Wilkey's claim is analyzed under the Fourth Amendment's "reasonableness" standard. *Id.* at 395 (holding that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard") (emphasis omitted).

"Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotation marks omitted). This analysis "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

Where factual disputes exist as to these considerations, summary judgment is not appropriate. *Kain v. Nesbitt*, 156 F.3d 669, 673 (6th Cir.1998) ("If plaintiff's version as to the nature and degree of force used is credited, which the district court failed to do, a jury question is created as to whether the force used was excessive.") (footnote omitted); *Santos v. Gates*, 287 F.3d 846, 855 (9th Cir.2002) ("In light of the factual disputes regarding the amount of force used, the circumstances under which it was applied, and the extent of the plaintiff's injuries, the question is properly for the jury whether the force applied by the officers was objectively reasonable under the totality of the circumstances."); *Breen v. Garrison*, 169 F.3d 152, 153 (2d Cir.1999) (per curiam) ("The issue of excessive force also was for the jury, whose unique task it was to determine the amount of force used, the injuries suffered, and the objective reasonableness of the officer's conduct.").

The reasonableness of a particular use of force must be assessed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. This perspective allows "for the fact that

police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. Nevertheless, the applicable standard is an objective one: "[T]he question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

In the present case, Wilkey was not committing any crime when Argo confronted him. Nor was Wilkey resisting arrest or even seeking to avoid an encounter with law enforcement officers. Instead, he consented to a pat down search prior to Argo's use of force against him. This search revealed that Wilkey was not carrying a gun, thereby considerably reducing the severity of any threat that Wilkey might have presented to Argo and Cranfield or to members of the public.

Argo's search of Wilkey, however, did result in the discovery of an object that Argo believed to be an ASP baton. Because Wilkey refused to confirm or deny Argo's accusation, but instead claimed that he had a right to carry the object and placed it back into his pocket after briefly displaying it, Argo was justified in taking some form of investigatory action to determine whether his suspicion about the object was correct. But we believe that a jury could reasonably conclude that Argo's actual reaction to Wilkey's placing the flashlight back into his pocket was not an objectively reasonable response. *Santos*, 287 F.3d at 854 (holding that where the plaintiff's evidence supported a finding that the defendants had applied force to restrain him, "the jury must determine not only whether the officers were justified in using force at all, but, if so, whether the

degree of force actually used was reasonable").

This court has recognized that even where some degree of force is necessary, gratuitous acts against a person who has been seized might violate the Fourth Amendment's reasonableness standard. *Phelps v. Coy*, 286 F.3d 295, 297, 301–02 (6th Cir.2002) (recognizing the necessity of analyzing Officer Coy's use of force against Phelps "in segments" where Coy arrested Phelps, placed him in handcuffs, took him to the police station for booking, and then beat him after he raised his leg in a manner that Coy perceived to be a threat to another police officer); *Santos*, 287 F.3d at 853 (explaining that "even where some force is justified, the amount actually used may be excessive").

Applying the above principle to the present case, Wilkey's account of his encounter with Argo, when viewed in the light most favorable to him, would permit a jury to conclude that Argo's reaction to Wilkey's placing the flashlight back into his pocket constituted the gratuitous application of force, rather than an objectively reasonable response to Wilkey's conduct. A jury could reasonably find that Argo's actions were neither commensurate with the threat that Wilkey presented nor consistent with a desire to determine whether Wilkey was indeed carrying an ASP baton. In fact, the record does not indicate whether Argo ever removed the flashlight from Wilkey's pocket to assess whether it was a dangerous weapon. Argo instead forced Wilkey's head, neck, and shoulders onto the hood of Cranfield's Jeep and then immobilized Wilkey by applying a forearm beneath his chin. This restraint lasted about 20 seconds, during which time Argo told Wilkey that he needed to go home, calm down, and work matters out with his wife. These instructions had no relationship to any danger that Wilkey might have

presented to either Argo or Cranfield. Nor did these comments relate to Wilkey's possession of an object that Argo thought might be an ASP baton.

For these reasons, we conclude that the record in the present case, when viewed in the light most favorable to Wilkey, would permit a jury to find that Argo used excessive force against Wilkey in violation of the Fourth Amendment's reasonableness standard. The district court therefore erred in concluding as a matter of law that Argo's use of force was objectively reasonable.

Our decision does not, however, prevent the district court from considering on remand whether Argo was entitled to qualified immunity, an affirmative defense that Argo raised as an alternative basis for summary judgment. The district court did not address the availability of qualified immunity and the parties did not brief the issue on appeal. We therefore decline to rule on whether Argo was entitled to qualified immunity. Nevertheless, we believe that a few remarks on the availability of qualified immunity in the present case would be appropriate.

"Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation." *Saucier v. Katz*, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (internal quotation marks omitted). To overcome an officer's claim of qualified immunity, a plaintiff must establish (1) that the facts alleged demonstrate that "the officer's conduct violated a constitutional right" and (2) that "the right was clearly established." *Id.* at 201. The latter inquiry, which is necessary only if the plaintiff's allegations establish the violation of a constitutional right, involves a determination of "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 201–02.

Despite the linguistic similarity between the "objective reasonableness standard" for evaluating excessive force claims, on the one hand, and the "reasonable officer" inquiry involved in the qualified immunity analysis, on the other, the two standards are not coterminous. *Id.* at 202–04 (rejecting the position, which was based upon a belief that "qualified immunity is merely duplicative in an excessive force case," that qualified immunity is not available if a material issue of fact exists as to an excessive force claim). Unlike the former question,

> [t]he qualified immunity inquiry, on the other hand, has a further dimension. The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Id.* at 204. This distinction between the "objective reasonableness standard" and the qualified immunity inquiry exists so as to "protect officers from the sometimes hazy border between excessive and acceptable force and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Id.* at 206 (internal quotation marks and citation omitted).

As noted above, we express no opinion as to whether Argo would be entitled to qualified immunity. The district court, however, is not precluded from considering

that issue on remand as an alternative to conducting a trial on the merits of Wilkey's claim.

## III.  CONCLUSION

For all of the reasons set forth above, we **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.