Diane BURNETT, Plaintiff,

v.

John BOTTOMS, et al., Defendants.

No. CV031891PHXLOA.

United States District Court,
D. Arizona.

May 2, 2005.

Stephen G. Montoya, Esq., Law Office of Stephen G. Montoya, Phoenix, AZ, for Plaintiff.

Kathleen C. Kerchansky, Office of the Attorney General Liability Management Section, Phoenix, AZ, for Defendants.

## ORDER

ANDERSON, United States Magistrate Judge.

This matter arises on the Motion of Defendants State of Arizona, Detective John Bottoms, Detective Jennifer Pinnow, and Sargent (retired) Robert Holley ("the State defendants" collectively) for Summary Judgement Based Upon Qualified Immunity (document # 31). On February 18, 2005, the Court held oral argument on the motion. All parties have previously consented in writing to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c)(1). (See, doc.# 20 and # 21). After considering all the relevant pleadings, including the relevant case law, and the arguments of counsel, the Court will grant the motion in part and deny it in part.

## BACKGROUND

Plaintiff Diane Burnett ("Burnett" or "Plaintiff") asserts violations of her federal constitutional rights and also alleges several state tort claims against three police officers with the Arizona Department of Public Safety ("DPS"), arising out of Bur-

nett's arrest on September 27, 2002. She seeks monetary damages under 42 U.S.C. § 1983 and Arizona law. Specifically, Burnett alleges: (1) violations of her constitutional rights under the First Amendment (freedom of speech and freedom of assembly) and Fourth Amendment (unlawful arrest or arrest without probable cause, commonly called false arrest, and the use of excessive force during the arrest) as applied to the states through the Fourteenth Amendment of the U.S. Constitution [1]; (2) assault and battery, (3) false imprisonment, (4) intentional infliction of emotional distress, and (5) an entitlement to an award of punitive damages and an award of attorney's fees and costs, jointly and severally. (document # 1).

On September 27, 2002, President George W. Bush was in downtown Phoenix to speak at a Republican fund raising dinner at the Phoenix Civic Center, bounded on the east and west by Third Street and Fifth Street and on the north and south by Washington Street and Jefferson Street ("the intersection"). (Defendants' Statement of Facts ("SOF") ¶ 3). Detective Bottoms, Detective Pinnow and Sgt. Holley were all asked to assist the Phoenix Police Department by working on the Civil Emergency Task Force Response Team due to the anticipated demonstration near the Phoenix Civic Plaza as a result of the President's visit. (Id. at ¶¶ 3, 6, 8). Sgt. Holley was assigned to a crowd control police squad. (Id. at ¶ 7).

Days before the President's visit and dinner, members of the Secret Service briefed the three officers and others who would assist with law enforcement during the President's visit. (Id. at ¶ 9). The

---

1. In her Complaint, Plaintiff alleges a generic "due process" violation. See, ¶¶ 1 and 22. This issue was not raised in either the subject motion or Response. The Court will not do so here *sua sponte*. The Supreme Court has made clear, however, that all claims that law

enforcement officers used excessive force should be analyzed under the Fourth Amendment rather than under a substantive due process approach. *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)

purpose of these briefings was to discuss the state's and federal government's mutual interest in protecting the President while, at the same time, ensuring pedestrian and vehicular safety. No party disputes that protecting the President of the United States is a compelling governmental interest. During the briefings, the Secret Service determined that the most appropriate manner to protect the President was to restrict pedestrian access from the southeast corner of the intersection except for those attending the function at the Civic Plaza. (*Id.* and videotape of the demonstration). Pedestrians, including protestors, however, were permitted to occupy the southwest, northeast and northwest corners but were not allowed to interfere with the flow of vehicular traffic. (*Id.*). Defendant Holley was assigned to the northwest corner of Third Street and Washington. (Defendant's SOF at ¶ 10) Defendants assert that Holley first observed Plaintiff when she was standing approximately 20–30 feet north of the intersection of Third Street and Washington. Plaintiff approached Holley who was standing in the street and yelled at him. (*Id.* at ¶ 11) Plaintiff approached Holley as he stood in the street, and he ordered Plaintiff to get back on the sidewalk. Plaintiff continued yelling at Holley and told him he could not prevent her from crossing the street. (*Id.*) Holley warned Plaintiff that if she attempted to cross the street at that location she would be arrested. Plaintiff continued arguing with Holley but remained on the sidewalk. Several minutes later, Plaintiff walked toward the intersection and came in contact with a mounted police officer. (*Id.* at ¶ 11, Exh. C ¶ 8) Holley observed Plaintiff argue with the mounted police officer and try to get past the officer by pushing on his horse. Holley then saw a crowd control officer approach Plaintiff and speak to her. Plaintiff appeared to argue with the officer and "swatted" at the officer's hands. (*Id.*

at ¶ 121 Exh. C ¶ 8) Holley approached Plaintiff and warned her that he would arrest her if she did not calm down. (*Id.*) Plaintiff continued her actions and she started to walk out into the street. When an officer stepped in front of Plaintiff to block her path, Plaintiff pushed the officer. (*Id.*) When Plaintiff pushed the officer, Holley ordered Plaintiff arrested for failure to obey a lawful order of a police officer. (*Id.;* Exh. C ¶ 9, Exh. B ¶¶ 8–9, Exh. A ¶ A) Holley states that another officer assisted him as Plaintiff pushed through the crowd control line. (*Id.,* Exh. C ¶ 10) Holley states that he ordered Plaintiff arrested because he had observed her disregard his orders and push an officer. (*Id.* at ¶ 14. Exh. C ¶¶ 8–11; Exh. C)

Officer Pinnow also observed Plaintiff push the mounted police officer's horse and shout at the crowd control officer and swat at his hands. (Defendants' SOF, Exh. B ¶ 8) Officer Pinnow also saw Holley approach Plaintiff and speak to her and noticed that Plaintiff continued to move forward toward the northeast corner. (*Id.*)

Several officers placed Plaintiff's hands behind her back. Defendants claim that Plaintiff resisted as the officers attempted to place flex cuffs on her wrists. (*Id.* at ¶ 13, Exh. C. ¶ 10; Exh. B, ¶¶ 8–9; Exh. A, ¶¶ 9–10) Defendants also assert that after her arrest, at least twice, Plaintiff went limp causing herself and the escorting officers to fall to the ground. (*Id.* at ¶ 15; Exh. C, ¶ 12; Exh. B, ¶¶ 11–13; Exh. A, ¶¶ 12–15) Defendants contend that because Plaintiff refused to walk on her own, officers had to carry her across the street to the police car. (Defendants' SOF, Exhs. A ¶ 14, Exh. B ¶ 15) During these events, Plaintiff received several abrasions. Defendant Pinnow also had

blood on her hands. (*Id.* at ¶ 16, Exh. B ¶ 14; Exh. A, ¶ 14)

Plaintiff offers a different version of the events. Plaintiff admits that she participated in the protest on September 27, 2002 at the intersection of Washington and Third Street. (Plaintiff's SOF, Exh. A ¶ 3) She states that she did not obstruct vehicular or pedestrian traffic at anytime. (*Id.*, Exh. A ¶ 9) She further states that she "did not walk into any area where law enforcement officers told [her] that [she] was not allowed to go." (*Id.*, Exh. A ¶ 10) She contends that during the demonstration, she crossed the street several times at the intersection of Washington and Third Street in the crosswalk with the green walk signal. (Plaintiff's SOF ¶ 11) She contends that at one point, the mounted officers rode their horses onto the sidewalk on the Northeast corner of the intersection where she and other protestors were standing. (*Id.* at ¶ 12) Plaintiff claims that two mounted officers intentionally wedged her between their horses. (*Id.*, Exh. A at ¶ 13) She states that the officers' behavior was not provoked and that she told one of the officers, "I can't believe you are doing this." (*Id.* ¶ 14) Plaintiff states that the officer looked at her and kept pushing her with his horse, wedging her even tighter between the horses. (*Id.* ¶ 15) Thereafter, Plaintiff claims that she "finally managed to push [her] way between the horses" and decided to leave that corner and walk around the intersection. (*Id.* at ¶ 14, Exh. A ¶ 16) Plaintiff claims that "while she was walking around the intersection, she attempted to cross the street from the Northwest corner of Washington and Third Street to the Northeast corner of the intersection in the crosswalk with the green walk signal." (*Id.* at ¶ 16) She claims that before she attempted to cross the street, she observed no signs or barriers indicating that the crosswalk was closed. (*Id.*) She also observed individuals who were not carry-

ing protest signs freely cross the street without any interference by law enforcement officers. (*Id.* at ¶ 18) Plaintiff contends that when she was in the crosswalk, Officers Bottoms, Pinnow, and Holley told her that she could not cross the street. She further claims that when she started to ask why she could not cross the street, the three officers immediately arrested her without giving her an opportunity to turn back to the Northwest corner of the intersection. (*Id.* at ¶¶ 19–21) Plaintiff further claims that after she was handcuffed, the arresting officers "forcibly" started to walk her to the southeast corner of Washington and Third Street. She claims that as she was walking, she grew dizzy, lost her balance and fell. (*Id.* at ¶ 25) Officers then carried her across the street where they "dropped her face down to the ground." (*Id.* at ¶ 26) Plaintiff contends that before she could stand, police officers picked her up to take her to a police car. When one of Plaintiff's hands slipped out of the handcuffs, Plaintiff claims that officers immediately put her in "three pairs of plastic handcuffs ... so tight that her wrists later swelled to almost twice their normal size and started to bleed." (*Id.* at ¶ 28) Plaintiff further claims that officers dragged her on her knees to the police car where she was left "handcuffed and bleeding" for nearly an hour with no ventilation on what was likely a hot September day. (*Id.* at 29–30) Based on the foregoing events, Plaintiff filed the pending Complaint alleging, inter alia, that Defendants violated her federal constitutional rights.

### *SUMMARY JUDGMENT*

A moving party may, at any time, move for summary judgment on all or any part of a claim. See, FED.R.CIV.P. 56(f) The Court may only grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, determines that "there

is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." See, FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Substantive law determines which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. In considering the evidence, the Court is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. The moving party need not disprove matters on which the opponent has the burden of proof at trial. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

The party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e); *Matsushita Elec., Industries Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). There is no genuine issue for trial unless there is sufficient evidence favoring the nonmoving party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505. However, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his [or her] favor." *Id.* at 255, 106 S.Ct. 2505.

Allegations of civil rights violations are to be liberally construed. *Thomas v. Younglove*, 545 F.2d 1171, 1172 (9th Cir. 1976).

## ANALYSIS

### I. Qualified Immunity

Defendants contend that the doctrine of qualified immunity shields them from Plaintiff's § 1983 claims. Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity protects "all but the plainly incompetent or those who knowingly violated the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). "Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, [the official] should be made to hesitate...." *Harlow*, 457 U.S. at 819, 102 S.Ct. 2727. However, where an official acts in an area where "clearly established rights are not implicated, the public interest may be better served by action taken 'with independence and without fear of consequences.'" *Id.* Qualified immunity protects public officials from a constitutional tort action for damages, as long as the official's conduct does not violate clearly established federal statutory or constitutional "rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. 2727. "[W]hether an official protected by qualified immunity may be held personally liable for allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action." *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)(quoting *Harlow*, 457 U.S. at 819, 102 S.Ct. 2727); *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 950 (9th Cir.2003). "Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." *Hunt-*

er, 502 U.S. at 227, 112 S.Ct. 534; *Bingham,* 341 F.3d at 950.

To determine whether individual public officials are entitled to qualified immunity, the Court must first identify "the specific right [they] allegedly violated." *Kelley v. Borg,* 60 F.3d 664, 666 (9th Cir.1995)(citing *Romero v. Kitsap County,* 931 F.2d 624, 627 (9th Cir.1991)). If Plaintiff fails to conclusively establish a constitutional violation, the inquiry ends and the state actors are immune from suit. *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). However, if the facts establish a constitutional violation, the next step is for the Court to determine "whether that right was so 'clearly established' as to alert a reasonable officer to its constitutional parameters." *Id.* If the right is not clearly established, the individual public officials are entitled to qualified immunity if a reasonable official could have believed that his or her conduct was lawful. *Thompson v. Souza,* 111 F.3d 694, 698 (9th Cir.1997). "To be clearly established, the law must be 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Newell,* 79 F.3d at 117(quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). In other words, "officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner,* 973 F.2d 295, 298 (4th Cir. 1992). "This is not to say that an official's action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness may be apparent." *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034. However, "when 'the defendants' conduct is so patently violative of the [plaintiff's] constitutional right but reasonable officials would know without guidance from the courts that the action was unconstitutional, closely analogous pre-existing case law is not

required to show that the law is clearly established." *Mendoza,* 27 F.3d at 1361 (quoting *Casteel v. Pieschek,* 3 F.3d 1050, 1053 (7th Cir.1993)). Thus, a constitutional right may be clearly established by common sense as well as closely analogous pre-existing case law. *Newell,* 79 F.3d at 117. The party asserting the constitutional injury bears the burden of showing that the right at issue was clearly established. *Sorrels v. McKee,* 290 F.3d 965, 969 (9th Cir.2002).

In *Saucier v. Katz, supra,* the Supreme Court clarified the qualified immunity defense. *Saucier* set forth a two-part test for qualified immunity: (1) whether "[t]aken in the light most favorable to the party asserting the injury … the facts alleged show the officer's conduct violated a constitutional right;" and (2) whether the constitutional right in question was "clearly established" such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." 533 U.S. at 201–02, 121 S.Ct. 2151.

## II. Fourth Amendment Claim—Arrest without Probable Cause

■ Plaintiff asserts that Defendants arrested her without probable cause in violation of her civil rights. The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., Amend. IV. It applies to states via the Fourteenth Amendment.

An arrest must be supported by probable cause. *Atwater v. City of Lago Vista,* 532 U.S. 318, 354, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001). Under Ninth Circuit law, "[p]robable cause exists when, under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the suspect] had commit-

ted a crime." *Peng v. Penghu,* 335 F.3d 970, 976 (9th Cir.2003); *Gasho v. United States,* 39 F.3d 1420, 1428 (9th Cir.1994). In Arizona, a police officer may, without an arrest warrant, arrest a person if the police officer has probable cause to believe:

1. A felony has been committed and probable cause to believe the person to be arrested has committed the felony.

2. A misdemeanor has been committed in his presence and probable cause to believe the person to be arrested has committed the offense.

A.R.S. § 13–3883(A) (2001); *State v. Keener,* 206 Ariz. 29, 75 P.3d 119, 121 (2003).

Defendants argue that (1) that probable cause existed to arrest Plaintiff, and (2) if not, Defendants are entitled to qualified immunity on Plaintiff's claim that she was arrested without probable cause. Defendants claim Plaintiff was arrested for failure to obey a lawful police order. Under Arizona Law, "[a] person shall not wilfully fail or refuse to comply with any lawful order or direction of a police officer invested by law with the authority to direct, control, or regulate traffic." A.R.S. § 28–622(A). A person who violates this section is guilty of a class 2 misdemeanor. A.R.S. § 28–622(B). The maximum sentence for a class 2 misdemeanor conviction is up to four months in jail and no more than a seven hundred fifty dollar fine. A.R.S. § 707(A)(2); A.R.S. § 13–802(B).

Here, there is a genuine issue of material fact regarding whether the subject officers had probable cause to arrest Plaintiff. Defendants claim that Sgt. Holley observed Plaintiff yelling at him and at other officers and he warned her that he would arrest her if she did not cease such behavior. Holley asserts that Plaintiff continued yelling at the officers, pushed a mounted officer's horse, "swatted" at another officer's hands, pushed an police officer, and attempted to cross the street after he ordered her not to do so. See, *Durruthy v. Pastor,* 351 F.3d 1080 (11th Cir.2003)(denial of summary judgment reversed; police officer had probable cause to arrest cameraman during public demonstration for violation of state statute prohibiting any pedestrian from being in the roadway).

Plaintiff, on the other hand, contends that she never impeded vehicular or pedestrian traffic during the demonstration, never went anywhere an officer told her she could not go, and was, without provocation, wedged between two mounted officers horses and "managed to push her way from between the horses." . (Plaintiff's SOF, Exh. A ¶ 16) She further claims that officers arrested her as she attempted to cross the street without giving her an opportunity to turn back to the other side of the street. She claims that her arrest was immediate and implies that she was given no prior order not to cross the street with a green light or against the red light. The record, including the videotape of the demonstration, does not contain enough evidence to support either Plaintiff's or Defendants' versions of the events. As set forth above, Plaintiff and Defendants offer conflicting versions of Plaintiff's arrest and the subsequent events alleged by Plaintiff. The videotape does not show Plaintiff's alleged encounters with officer Holley before her arrest, or the alleged incident with the mounted officers. It does depict Plaintiff cross the street without interference from police and later shows her arrest. From its review of the videotape, the Court cannot determine what led up to Plaintiff's arrest—namely whether she was given an order that she failed to obey or whether Plaintiff's other interactions with Holley would have supported a determination of probable cause to arrest her for failure to obey an order.

■ However, if Defendant Holley had no prior interactions with Plaintiff where she had disregarded his orders, as Plaintiff

has testified, and ordered Plaintiff arrested immediately after telling her not to cross the street without giving her any opportunity to comply with the order, there would not have been probable cause to support her arrest. Viewing the record in the light most favorable to Plaintiff, as the Court must, the Court finds that a reasonable jury could find a violation of the Fourth Amendment's prohibition against an unreasonable seizure, and therefore, an unlawful seizure. See, *Saucier*, 533 U.S. at 201–02, 121 S.Ct. 2151. Summary judgment is not appropriate on this particular claim.

As previously discussed, the doctrine of qualified immunity does not apply if a reasonable officer would have known that his conduct was unlawful under the circumstances. 533 U.S. at 202–02, 121 S.Ct. 2151. The facts necessary to decide this issue are disputed. However, viewed in the light most favorable to Plaintiff, the facts suggest that no reasonable officer would have believed there was probable cause to arrest Plaintiff if the only police order that Plaintiff allegedly violated was the order that she not cross the street and she was arrested immediately upon the issuance of that order without an opportunity to comply. In view of the disputed facts, the Court finds that summary judgment as a matter of law is not appropriate.

### III. Fourth Amendment—Excessive Force

Plaintiff further claims that the police officers used excessive force in effectuating her arrest in violation of the Fourth Amendment. The Ninth Circuit has held that a § 1983 claim may be based upon the Fourth Amendment if the police used excessive force during an arrest. *Robins v. Harum*, 773 F.2d 1004 (9th Cir.1985). Police officers may only use force that is objectively reasonable under the circumstances. *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In the Ninth Circuit, courts evaluate claims of excessive force under the Fourth Amendment's objective reasonableness standard. *Pierce v. Multnomah County*, 76 F.3d 1032, 1043 (9th Cir.1996). "[T]he reasonableness inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397, 109 S.Ct. 1865. Trial courts must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396, 109 S.Ct. 1865 (internal citations omitted). Assessing the "nature and quality" of a given "intrusion" requires the fact finder to evaluate the "type and amount of force inflicted." *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir.1994). The governmental interest is measured by considering: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; (3) whether s/he was actively resisting arrest, and any other exigent circumstances present at the time. *Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir.2001). Because this balancing "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit] has held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir.2002).

Defendants argue that they are entitled to qualified immunity on Plaintiff's claim of excessive force. The Court must first determine, whether viewed in the light most favorable to Plaintiff, the facts alleged show the officers' conduct violated a constitutional right. *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. Where the facts are dis-

puted, their resolution and determinations of credibility "are manifestly the province of the jury." *Santos v. Gates,* 287 F.3d 846, 852 (9th Cir.2002).

It is clearly established that "[t]he use of excessive force by police officers in an arrest violates the arrestee's Fourth Amendment right to be free from an unreasonable seizure." *White v. Pierce County,* 797 F.2d 812, 816 (9th Cir.1986). Here, Plaintiff contends that officers handcuffed her and forcibly began to walk her across the street. She claims that she grew dizzy and fell and that before she could stand, officers picked her up and carried her across the street where they dropped her face down to the ground. Officers then picked Plaintiff up and began taking her to a police car. When one of Plaintiff's hands came out of the handcuffs, they immediately placed her in three pairs of plastic cuffs which were so tight that they caused Plaintiff's wrists to swell and bleed. Officers then, according to Plaintiff, dragged Plaintiff on her knees across the asphalt pavement to the police car where they left her for nearly an hour. Plaintiff claims that she neither resisted arrest nor struggled once arrested. If Plaintiff's version of the facts is believed, Defendants used excessive force during and after her arrest. Thus, viewing the record in the light most favorable to Plaintiff, she could establish a violation of the Fourth Amendment.

Under the qualified immunity analysis, "[i]f a [Constitutional] violation could be made out on a favorable view of the party's submissions, the next sequential step is to ask whether the right was clearly established." *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. Qualified immunity operates "to protect officers from the sometimes 'hazy border between excessive and acceptable force'" *Id.* at 206, 121 S.Ct. 2151. "Because the focus is on whether the officer had fair notice that [the officer's] con-duct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation. *Brosseau v. Haugen,* —— U.S. ——, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004)("Of course, in an obvious case, the [ ] standards enunciated in *Graham v. Connor* (citations omitted) can 'clearly establish' the answer, even without a body of relevant case law"); *Hope v. Pelzer,* 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)(noting in a case where the Eighth Amendment violation was "obvious" there need not be a materially similar case for the right to be clearly established). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151. The Fourth Amendment prohibits a wide range of governmental intrusions on the person. "The Fourth Amendment's requirement that a seizure be reasonable prohibits more than the unnecessary strike of a nightstick, sting of a bullet, and thud of a boot." *Fontana v. Haskin,* 262 F.3d 871, 878 (9th Cir.2001). It is well established that overly tight handcuffs can constitute excessive force. *Meredith v. Erath,* 342 F.3d 1057, 1061 (9th Cir.2003); *LaLonde v. County of Riverside,* 204 F.3d 947, 960 (9th Cir.2000). Even "[t]he use of handcuffs is the use of force, and such force must be objectively reasonable under the circumstances." *Muehler v. Mena,* —— U.S. ——, 125 S.Ct. 1465, 1472, 161 L.Ed.2d 299 (2005)(concurring opinion of Justice Kennedy citing *Graham v. Connor*). "[W]here there is no need for force, any force used is constitutionally unreasonable." *Headwaters For-*

*est Def. v. County of Humboldt,* 211 F.3d 1121, 1133 (9th Cir.2000).

Plaintiff argues that she did not resist arrest and that she was not a threat to officer safety or the safety of others. Although she was not charged with any crime subsequent to her arrest, the crime of refusing to obey a police officer's order is only a class 2, non-violent misdemeanor and is not a particularly serious crime. Defendants, on the other hand, argue that Plaintiff resisted arrest and refused to cooperate once arrested. After officers placed flex cuffs on Plaintiff's wrists, Defendants claim that Plaintiff "went limp" pulling herself and the officers to the ground twice. Defendants claim that Plaintiff's own actions of resisting arrest, intentionally "going limp" and falling to the ground caused her abrasions. Plaintiff claims that officers used unnecessary force in walking her across the street such that she fell because she was dizzy. She further contends that after the officers carried her across the street, they dropped her face down on the ground and then dragged her on her knees to a police car where they left her for an hour without any ventilation and, presumably, never loosened her handcuffs.

The Ninth Circuit has repeatedly stated that whether the force used to arrest an individual is reasonable is "ordinarily a question of fact for the jury." *Liston v. County of Riverside,* 120 F.3d 965, 976 n. 10 (9th Cir.1997)(citing *Forrester v. City of San Diego,* 25 F.3d 804, 806 (9th Cir. 1994)). Viewing the record in the light most favorable to Plaintiff on her excessive force claim, the Court finds that she has established the existence of disputed material issues of fact which may only be resolved by a jury. Because Plaintiff and the Defendants offer varying accounts of the events surrounding Plaintiff's arrest—namely whether Plaintiff resisted arrest, whether she intentionally caused herself to

fall, whether the officers intentionally and unreasonably dropped her "face down to the ground," intentionally and unreasonably dragged her on her knees on the hot September Phoenix asphalt pavement, and unreasonably placed her in handcuffs that were excessively tight for an unreasonable period of time—the Court finds that summary judgment as a matter of law is inappropriate. How these facts are resolved by the jury through the use of special interrogatories will determine whether the officers' actions constituted excessive force in violation of the Fourth Amendment and whether the officers are entitled to qualified immunity as a matter of law. See, *Littrell v. Franklin,* 388 F.3d 578 (8th Cir.2004)(district court improperly submitted the legal question of qualified immunity to the jury); *accord Alvarado v. Picur,* 859 F.2d 448, 451 (7th Cir.1988) (rejecting a jury instruction that told jurors the defendants would be immune from suit if their actions did not violate clearly established law, reasoning "[h]ow was the jury supposed to determine the law on the dates in question? And, if the jury somehow could determine the law on the dates in question, how was it supposed to determine if that law was 'clearly established'?").

If the officers engaged in the conduct that Plaintiff alleges and if Plaintiff never resisted arrest or struggled and presented no threat to officer safety or the safety of others, a trier of fact could find that the officers used excessive force during the course of her arrest in violation of the Fourth Amendment. Additionally, if Plaintiff cooperated after she was handcuffed and officers still physically picked her up and carried her, dropped her face down to the ground, and placed her in excessively tight handcuffs which caused her wrists to bleed and refused to loosen them upon fair notice the handcuffs were too tight or were on for an unreasonable

period of time, the officers would not be entitled to qualified immunity. Before September, 2002 when these events took place, it was clearly established that a police officer was not entitled to use such force against a handcuffed, secured, cooperative prisoner or arrestee. See, *Jones v. Buchanan*, 325 F.3d 520, 534 (4th Cir. 2003). In view of the foregoing, summary judgment is denied.

## IV. First Amendment Claims

■ Plaintiff also argues that Defendants violated her First Amendment rights by restricting her from crossing the street. She states that public streets and sidewalks in downtown Phoenix are presumptively open to the public and that citizens have a fundamental right to free movement. *Nunez v. City of San Diego*, 114 F.3d 935, 944 (9th Cir.1997). Plaintiff concedes that protecting the President is a "compelling government interest." (document #35 at 6) However, she argues that because closure of the crosswalk was unlawful, the order that she remove herself from the crosswalk violated her First Amendment rights. See, *Nunez*, 114 F.3d at 944.

The Court disagrees. At issue is the restriction that protestors not block vehicular or pedestrian traffic in the streets. Such restrictions did not infringe upon Plaintiff's right of free movement. This case is appropriately analyzed as a content-neutral "time, place, and manner" restriction. The Supreme Court has stated that the government may impose reasonable restrictions on the time, place, or manner of protected speech, providing that the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information. *United For Peace & Justice v. City of New York*, 323 F.3d 175, (2d

Cir.2003)(citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)). Under a "time, place, and manner" analysis, Defendants must show that the closure of the southeast corner of Washington and Third Street, the restriction that protestors not block vehicular or other traffic in the street or that the officers' orders that she not cross the street even with a green pedestrian light were: (1) content neutral; (2) "narrowly tailored to serve a significant governmental interest;" and (3) gave people "ample alternatives" to communicate to their intended audience. *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002). Here, Defendants satisfy all three of these requirements.

First, there is no dispute that the restriction was content-neutral. Second, protecting the President is undisputedly a significant interest. Third, closing only one of four corners of a busy downtown intersection in the state's largest city and restricting and safeguarding protestors from moving vehicular traffic using the streets despite a large demonstration involving a mass of people during normal weekday business hours were "narrowly tailored" to serve an important governmental interest. Courts have repeatedly recognized that protecting the President and the Vice–President is a significant interest. See, *Saucier v. Katz*, 533 U.S. 194, 209, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)(dismissing an action against federal agents who arrested a protestor who entered a buffer zone of the Vice–President.). Finally, as the videotape of the incident shows, protestors, including Plaintiff, and other members of the public had ample opportunity to communicate their messages from other areas, including the other three corners of the intersection. Plaintiff had ample opportunity to participate in the demonstration from the sidewalks and

from the other three corners of the intersection. Thus, the restriction of the subject southeast corner and prohibition of pedestrian traffic from crossing the streets such that protestors did not impede vehicular traffic and risk pedestrian safety did not violate Plaintiff's First Amendment Rights.

 Similarly, Plaintiff's arrest for failure to obey an order of the police officer did not violate her "freedom of movement." In support of her "freedom of movement" argument, Plaintiff cites *Nunez v. City of San Diego,* 114 F.3d 935 (9th Cir.1997), a case brought under the Equal Protection Clause. (document # 35 at 5) In *Nunez,* the court applied strict scrutiny to a law implicating the "fundamental right of free movement." *Id.* at 944 (citing *Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982))(stating that legislation that impinges on a fundamental right is subject to strict scrutiny.). At issue in *Nunez,* was San Diego's juvenile curfew ordinance which prohibited all minors under the age of eighteen from loitering anywhere in public after 10:00 p.m.. *Id.* at 938. A juvenile curfew ordinance which restricted all movement in public is not analogous to the closure of a single city street corner or pedestrian traffic across Third Street.

The only movement of Plaintiff's which was restricted on September 27, 2002 was lingering on the southeast corner on Third Street and Washington, interfering with vehicular or pedestrian traffic in the streets or crossing Third Street contrary to a police officer's orders. Plaintiff was free to occupy or traverse any of the other corners of the intersection or any other part of downtown. The restriction of one corner or one street due to the President's anticipated presence and the prohibition that protestors not impede vehicular traffic in the streets did not unduly restrict Plaintiff's movement and did not violate Plain-

tiff's First Amendment rights. Finding no genuine issues of material fact, the Court will grant summary judgment as to Plaintiff's First Amendment claims.

Assuming *arguendo* that Defendants violated Plaintiff's First Amendment rights, Plaintiff has wholly failed in proving the second sequential step in the *Saucier* qualified immunity analysis, i.e., whether the right was clearly established. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. Plaintiff has not provided the Court with any cases that would have alerted a reasonable officer on or before September, 2002, to the constitutional parameters of a person's First Amendment rights under the same or similar circumstances involved herein. Plaintiff having failed to prove that her First Amendment rights under the facts of this case were clearly established, the individual police officers are entitled to qualified immunity since a reasonable official could have believed that his or her conduct was lawful. *Thompson v. Souza,* 111 F.3d 694, 698 (9th Cir.1997).

In accordance with the foregoing,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (document # 31) is **GRANTED** in part and **DENIED** in part.

**IT IS FURTHER ORDERED** that summary judgment is **GRANTED** in favor of Defendants as to Plaintiff's First Amendment claims and **DENIED** as to Plaintiff's Fourth Amendment claims.