**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KATHLEEN ESPINOSA, individually
and as personal representative of
the Estate of decedent Asa
Sullivan; ASA SULLIVAN; A. S., by
and through his Guardian ad
Litem; NICOLE GUERRA,
　　　　　　*Plaintiffs-Appellees,*

　　　　　　v.

CITY AND COUNTY OF SAN
FRANCISCO; HEATHER FONG, in her
capacity as Chief of Police,
　　　　　　*Defendants,*

　　　　　　and

JOHN KEESOR, Police Officer;
MICHELLE ALVIS, Police Officer;
PAUL MORGADO, Police Officer,
　　　　　　*Defendants-Appellants.*

No. 08-16853

D.C. No.
3:06-cv-04686-JSW

OPINION

Appeal from the United States District Court
for the Northern District of California
Jeffrey S. White, District Judge, Presiding

Argued and Submitted
October 5, 2009—San Francisco, California

Filed March 9, 2010

Before: Procter Hug, Jr. and Richard A. Paez, Circuit
Judges, and George H. Wu,* District Judge.

Opinion by Judge Hug;
Partial Concurrence and Partial Dissent by Judge Wu

---

*The Honorable George H. Wu, United States District Judge for the
Central District of California, sitting by designation.

**COUNSEL**

Peter J. Keith, Deputy City Attorney, San Francisco, California, for the appellants.

Benjamin Nisenbaum, Law Offices of John L. Burris, Oakland, California and Julie M. Houk, Law Offices of James B. Chanin, Berkeley, California, for the appellees.

**OPINION**

HUG, Senior Circuit Judge:

Officers of the San Francisco Police Department and the City and County of San Francisco ("defendants") brought an interlocutory appeal from the district court's denial of their summary judgment motion in this 42 U.S.C. § 1983 action brought by Kathleen Espinosa and other survivors of Asa Sullivan ("plaintiffs"). Plaintiffs allege that Officers Paulo Morgado, Michelle Alvis, and John Keesor violated Asa Sullivan's Fourth Amendment rights by entering and searching an apartment, using unreasonable force, and intentionally or recklessly provoking a confrontation. The three officers entered an apartment in which Asa Sullivan was staying, searched it, and Officers Alvis and Keesor fatally shot Sullivan. We review *de novo* the denial of defendants' summary judgment motion, *Hopkins v. Bonvicino,* 573 F.3d 752, 762 (9th Cir. 2009), and we affirm.

The district court properly denied defendants' summary judgment motion regarding whether Officers Morgado, Alvis, and Keesor are entitled to qualified immunity for the alleged

Fourth Amendment violations. For summary judgment, we determine whether, viewing the evidence in the light most favorable to the non-moving party, "there are any genuine issues of material fact and whether the district court correctly applied the substantive law." *Olsen v. Idaho State Bd. of Medicine*, 363 F.3d 916, 922 (9th Cir. 2004). For qualified immunity, we determine whether the facts show that (1) the officer's conduct violated a constitutional right; and (2) the right which was violated was clearly established at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Hopkins*, 573 F.3d at 762. A right is clearly established if a reasonable officer would know that his conduct was unlawful in the situation he confronted. *Headwaters Forest Defense v. County of Humbolt*, 276 F.3d 1125, 1129 (9th Cir. 2002). If the officers did not violate a constitutional right, then they are entitled to immunity. *Hopkins*, 573 F.3d at 762. If the officers violated such a right, but it was not clearly established, then they are entitled to immunity. *Id.*

In this case, the district court properly denied the summary judgment motion because there are genuine issues of fact regarding whether the officers violated Asa Sullivan's Fourth Amendment rights. Those unresolved issues of fact are also material to a proper determination of the reasonableness of the officers' belief in the legality of their actions. *See Santos v. Gates*, 287 F.3d 846, 855 n.12 (9th Cir. 2002) (finding it premature to decide the qualified immunity issue "because whether the officers may be said to have made a 'reasonable mistake' of fact or law may depend on the jury's resolution of disputed facts and the inferences it draws therefrom") (internal cite omitted).

On June 6, 2006, Officers Morgado, Alvis, and Keesor entered an apartment in which Sullivan, the victim, was staying, and shot and killed him. Evidence indicated that Sullivan was staying at the apartment ("the apartment") with the permission of the lease holders and another resident, Jason Martin. That evening, the police received a call in which a

neighbor stated that the front door of the apartment was swinging open and that the location could be a drug house. Officer Morgado arrived and saw that the apartment door was closed. He pushed up against the front door and it opened slightly. He then looked in the windows and saw several items inside. He requested police dispatch call security for the apartment complex and another police unit for a walk-through of the apartment. Officer Morgado then pushed open the apartment door and entered the apartment. After entering, he saw a bloody shirt hanging over the top of an interior door. In a post-incident interview with investigators, he stated that he could not tell if the blood was fresh or dry, but later stated it appeared fresh.

Officers Alvis and Keesor arrived and entered the apartment. All three officers searched the first floor and found nothing except paint cans and painting sheets. Officer Keesor stated that it looked like the apartment was being renovated and that he did not have any reason to believe there were squatters there. He stated that they found nothing to indicate an emergency, except for the bloody shirt.

The officers continued searching the apartment and on the second floor, they found a locked bedroom. They announced that they were the police and kicked down the bedroom door. Inside the room, they found resident, Jason Martin. They ordered him to the ground and handcuffed him. He was cooperative and complied with their requests. They searched him and found a knife. Then, they heard noises coming from the attic indicating that someone was in the attic.

Officer Alvis climbed into the attic with her gun drawn. Officers Morgado and Keesor entered the attic after Officer Alvis with their guns drawn as well. It was dark, but Officers Alvis and Morgado had flashlights. Officer Alvis shouted that she saw Sullivan. An officer responded over the radio "Hey, why don't we just pull back really quick, set up a perimeter and just try to get him later." Officer Alvis then shouted

"Cover both closets. I have him at gunpoint. He's not going anywhere. . . ." The officers told Sullivan to put up his hands, but he failed to follow the instruction. Officers Keesor and Alvis fired their guns at Sullivan, fatally wounding him. Officer Keesor stated that he shot because he believed that he saw something black in Sullivan's hand that looked like a gun. Officer Alvis stated that she shot because she thought she saw something in Sullivan's hand and that she saw him move his right arm. Sullivan was unarmed.

## I.   Warrantless Entry and Search of Home

[1] The district court properly denied defendants' summary judgment motion on whether they were entitled to qualified immunity for the warrantless entry and search of the apartment because there are questions of fact regarding the first prong of the qualified immunity test, *i.e.*, whether the officers violated Sullivan's Fourth Amendment rights. The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV. For the Fourth Amendment to apply, one must have a reasonable expectation of privacy in the place that is invaded. *Minnesota v. Carter*, 525 U.S. 83, 88 (1998). A search of a home or residence without a warrant is presumptively unreasonable. *Lopez-Rodriguez v. Mukasey*, 536 F.3d 1012, 1016 (9th Cir. 2008). A warrantless entry into a home violates the Fourth Amendment unless an exception to the Fourth Amendment warrant requirement applies, such as emergency, exigency, or consent. *Id.*

## A.   Reasonable Expectation of Privacy

[2] The district court properly found that there are questions of fact regarding whether Sullivan had a reasonable expectation of privacy in the apartment under the Fourth Amendment. An overnight guest in a home staying with the permission of the host has a reasonable expectation of privacy under the Fourth Amendment. *Minnesota v. Olson*, 495 U.S. 91, 98-100 (1990); *United States v. Armenta*, 69 F.3d 304,

308-09 (9th Cir. 1995). Here, there is evidence that Sullivan was staying in the apartment with the permission of a lease holder, Bryant Gudor, and another resident, Jason Martin. The evidence strongly suggests that the lease holders were in possession of the apartment on the day of the entry and search because the lease holders were charged June rent for the apartment, the lease holders had not returned the keys for the apartment, and management for the apartment testified that they considered the lease holders at that time to be in possession of the apartment. Although defendants argue that Sullivan had no privacy expectation, because the evidence strongly indicates that Sullivan had permission to stay in the apartment from a lease holder, Bryant Gudor, and a resident, Jason Martin, defendants have failed to show as a matter of law that Sullivan did not have a reasonable expectation of privacy. *See United States v. Davis*, 932 F.2d 752, 756-57 (9th Cir. 1991) (holding that the defendant had a reasonable expectation of privacy in an apartment where he was free to come and go and had independent access, stored items, and joint control); *United States v. Young*, 573 F.3d 711, 716-20 (9th Cir. 2009) (holding that the defendant had a reasonable expectation of privacy in his hotel room where the hotel had not informed him that he was evicted or taken any action to evict him); *United States v. Bautista*, 362 F.3d 584, 589-91 (9th Cir. 2004) (holding that hotel guest who used stolen credit card had an expectation of privacy in the rented hotel room and that the officer's entry into room was not supported by probable cause).

## B.   The Emergency and Exigency Exceptions

**[3]** The district court properly found that defendants failed to show as a matter of law that the emergency and exigency exceptions to the Fourth Amendment warrant requirement applied. These two "exceptions are 'narrow' and their boundaries are 'rigorously guarded' to prevent any expansion that would unduly interfere with the sanctity of the home." *Hopkins*, 573 F.3d at 763 (quoting *United States v. Stafford*, 416

F.3d 1068, 1073 (9th Cir. 2005)). Under the emergency exception, an officer may enter a home without a warrant to investigate an emergency that threatens life or limb if the officer has objectively reasonable grounds to believe that an emergency exists and that his immediate response is needed. *Id.* at 763-64. This exception is derived from police officers' community caretaking function, allowing them to enter a home when an emergency which threatens physical harm is presented. *Id.* at 763. The exigency exception, in contrast, stems from police officers' investigatory function: it allows an officer to enter a residence without a warrant if he has "probable cause to believe that a crime has been or is being committed and a reasonable belief that [his] entry" is needed to stop the destruction of evidence or a suspect's escape or carry out other crime-prevention or law enforcement efforts. *Id.* Both exceptions, however, require that the officer have an objectively reasonable belief that the circumstances justify entry. *Id.*

### i. Officer Morgado

[4] Viewing the evidence in the light most favorable to the plaintiffs, defendants failed to show as a matter of law that the emergency or exigency exceptions to the Fourth Amendment warrant requirement applied with regard to Officer Morgado's entry and search of the apartment. The only evidence that Officer Morgado had prior to forcing open the front door of the apartment and entering the unit was: (1) the neighbor's report that the front door had been swinging open and that it might be a drug house; (2) a visual inspection through a window that, according to Officer Morgado, revealed "several items, unknown items" inside; and (3) the security officer's statement that the unit was supposed to be vacant and that the front door lock was not one of the approved locks installed by the landlord. This evidence does not establish that Officer Morgado could have had an objectively reasonable belief that a life-threatening emergency was occurring or a crime was in progress. Any evidence found after Officer Morgado entered

the apartment, such as the bloody shirt or knife on Jason Martin, is irrelevant. This court has stated that evidence discovered after an illegal entry cannot be used retroactively to justify a search. *United States v. Licata*, 761 F.2d 537, 543 (9th Cir. 1985) (stating that the "exigencies must be viewed from the totality of circumstances known to the officers at the time of the warrantless intrusion."). Thus, defendants fail to show as a matter of law that the emergency or exigency exceptions applied with regard to Officer Morgado's entry and search of the apartment. *See Hopkins*, 573 F.3d at 764-69 (holding that the officers who responded to minor hit-and-run could not justify their warrantless entry and that there was no probable cause where the officers entered the home based on statements by a witness that the resident was in an accident and smelled of alcohol).

### ii.   Officers Keesor and Alvis

Viewing the evidence in the light most favorable to plaintiffs, defendants also failed to show that the emergency or exigency exceptions applied with regard to Officers Keesor's and Alvis's entry and search of the apartment. Defendants argue that the exceptions apply to Officers Keesor's and Alvis's entry because both officers (1) were aware of the bloody shirt prior to entry; and (2) reasonably relied on Officer Morgado's instruction to enter and search the apartment.

**[5]** First, defendants fail to show as a matter of law that Officers Keesor and Alvis were aware of the bloody shirt prior to entry. Officer Morgado requested an additional unit for a walk-through of the apartment before he found the bloody shirt and cannot recall if he told the officers about the bloody shirt upon their arrival prior to entry. Officer Alvis stated that Officer Morgado told police headquarters about the bloody shirt. Officer Keesor, immediately after the shooting, did not tell investigators that Officer Morgado told him about the bloody shirt. Later, when he was deposed, Officer Keesor stated that Officer Morgado did tell him about the bloody shirt

prior to entry. Viewing the evidence in the light most favorable to plaintiffs, defendants have failed to establish as a matter of law that Officers Keesor and Alvis were aware of the bloody shirt prior to their entry.

Defendants also failed to show as a matter of law that Officers Keesor and Alvis reasonably relied on Officer Morgado's instructions to enter the apartment. An officer is not liable for acting on information supplied by another officer, even if that information later turns out to be wrong, if he has an objectively reasonable, good-faith belief that he is acting pursuant to proper authority. *Motley v. Parks*, 432 F.3d 1072, 1081-82 (9th Cir. 2005) (en banc). The officer relying on the information must make reasonable inquiries to determine if there is a sufficient basis for the entry and search. *Id.* at 1081-82. "The lynchpin is whether the officer's reliance on the information was objectively reasonable." *Id.* at 1082.

**[6]** Viewing the evidence in the light most favorable to the plaintiffs, there is a material issue of fact regarding whether Officer Keesor's and Alvis's reliance on information gathered by Officer Morgado was objectively reasonable. Officer Morgado instructed the officers to clear the house. It is unclear if the officers knew of the bloody shirt prior to entry. Even if they did, the record does not show whether they inquired about the nature of the shirt, whether Officer Morgado knew that it was blood, whether the blood appeared fresh or old, or whether there was blood on any other area of the apartment. The record also does not show that Officers Keesor and Alvis made inquiries about other facts which would allow a warrantless entry and search of the apartment. Viewing the evidence in the light most favorable to the plaintiffs, there is a material question of fact regarding the reasonableness of the officers' reliance. *See Torres v. City of Los Angeles*, 548 F.3d 1197, 1212 (9th Cir. 2008) (holding that there was a material issue of fact regarding whether a reasonable officer would have relied on information possessed by the detectives without further verification where the detectives had a general

description of the suspect, a witness who identified the suspect in a suggestive photograph presentation, no evidence of plaintiff's gang affiliation, and no physical evidence tying plaintiff to the crime).

## D. Consent

**[7]** Defendants also failed to prove as a matter of law that the consent exception to the Fourth Amendment warrant requirement applied. Defendants argue that the security guard for the apartment complex had apparent authority to consent to the entry and search of the apartment and that the guard implied consent by agreeing to watch the windows of the apartment while Officer Morgado entered. A third party's consent to the search of another person's belongings is valid if the consenting party has actual or apparent authority to consent. *United States v. Ruiz*, 428 F.3d 877, 880 (9th Cir. 2005). To establish apparent authority, it must be shown that (1) the officer believed an untrue fact which made him believe the consent-giver had control over the area searched; (2) it was objectively reasonable for the officer to believe that the fact was true; and (3) the consent-giver had actual authority. *Id.* at 880-81. Regarding implied consent, only in narrow circumstances may consent be implied by actions and in most implied consent cases it is the suspect himself who takes an action which implies consent. *United States v. Impink*, 728 F.2d 1228, 1233 n.3 (9th Cir. 1984); *United States v. Rosi*, 27 F.3d 409, 411-12 (9th Cir. 1994). It is "a most uncommon situation" where the court is asked to infer consent from a third party's actions. *Impink*, 728 F.2d at 1233 n.3.

**[8]** In this case, defendants fail to show that there are no questions of fact regarding whether the security guard had apparent authority to consent and implied consent. When Officer Morgado was interviewed immediately after the shooting, he stated that (1) he asked the security guard if he had a key to the apartment; (2) the guard said he did not and that the lock was not their lock; and (3) he asked the guard to

stand outside and scream if he saw anyone climbing out of a window. When he was deposed, Officer Morgado added that the security guard told him the apartment was vacant. The two security guards involved stated that Officer Morgado asked them for the keys; neither guard stated that Officer Morgado asked them about the status of the apartment. Viewing the evidence in the light most favorable to plaintiffs, Officer Morgado did not ask and was not told by security that the apartment was vacant and when he looked in the window he saw several items which could have indicated occupancy. Because defendants cannot show that Officer Morgado believed an untrue fact (*i.e.*, that no one lived in the apartment), and cannot show Officer Morgado had any objectively reasonable grounds to believe the apartment was vacant, it was proper for the district court to find that consent was not established as a matter of law. *See United States v. Shaibu*, 920 F.2d 1423, 1426-27 (9th Cir. 1990) (declining to imply consent where officers did not request entry and no steps were taken to imply consent); *Impink*, 728 F.2d at 1233 & n.3 (holding implied consent was not given by third party).

## II.   Unreasonable Force

**[9]** The district court properly denied defendants' summary judgment motion regarding whether the officers are entitled to qualified immunity for allegedly violating Sullivan's Fourth Amendment rights by using excessive force. Fourth Amendment claims of excessive or deadly force are analyzed under an objective reasonableness standard. *Scott v. Harris*, 550 U.S. 372, 381 (2007). To determine if a Fourth Amendment violation has occurred, we must balance the extent of the intrusion on the individual's Fourth Amendment rights against the government's interests to determine whether the officer's conduct was objectively reasonable based on the totality of the circumstances. *Graham v. Connor*, 490 U.S. 386, 396-97 (1989); *Price v. Sery*, 513 F.3d 962, 968 (9th Cir. 2008)*; Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003). Our analysis involves three steps. First, we must assess

the severity of the intrusion on the individual's Fourth Amendment rights by evaluating "the type and amount of force inflicted." *Miller*, 340 F.3d at 964; *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003). Next, we must evaluate the government's interests by assessing (1) the severity of the crime; (2) whether the suspect posed an immediate threat to the officers' or public's safety; and (3) whether the suspect was resisting arrest or attempting to escape. *Id.; Graham*, 490 U.S. at 396. Third, "we balance the gravity of the intrusion on the individual against the government's need for that intrusion." *Miller*, 340 F.3d at 964. Ultimately, we must balance the force that was used by the officers against the need for such force to determine whether the force used was "greater than is reasonable under the circumstances." *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002). In deadly force cases, "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985). The parties "relative culpability" *i.e.*, which party created the dangerous situation and which party is more innocent, may also be considered. *Scott,* 550 U.S. at 384. Finally, this court has often held that in police misconduct cases, summary judgment should only be granted "sparingly" because such cases often turn on credibility determinations by a jury. *Drummond*, 343 F.3d at 1056.

**[10]** Here, defendants failed to show that there are no questions of fact regarding whether Officers Morgado, Keesor and Alvis used unreasonable force when they entered the attic and pointed loaded guns at Sullivan. The three officers climbed into the attic and each pointed a gun at Sullivan. With regard to the force used, pointing a loaded gun at a suspect, employing the threat of deadly force, is use of a high level of force. The officers pointed guns at Sullivan knowing that he had not been accused of any crime. Sullivan had not caused the officers to forcibly enter the home; he ran from them. Sullivan did not present a danger to the public. Sullivan could not

escape from the attic because it had only one exit. The bloody shirt and finding a knife on resident Jason Martin may have suggested some risk of harm. However, the officers offered inconsistent testimony regarding whether the blood appeared fresh or old. Viewing the evidence most favorably for plaintiffs, the officers did not know if the blood was new or old. With regard to the knife, according to Officer Keesor, the officers kicked down Martin's bedroom door, Martin put his hands up, allowed the officers to handcuff him even though he had not been accused of any crime, and complied with their demands. After he was arrested, they found a knife. However, his behavior did not make future danger more likely. Viewing the evidence in the light most favorable to plaintiffs, even considering the shirt and knife, defendants fail to show that there are not questions of fact regarding whether the level of force used was reasonable at the point when they entered the attic given the low level of threat. *See Hopkins*, 573 F.3d at 776-77 (affirming denial of summary judgment on excessive force claim where suspect was not a safety threat, did not have a gun, and the officers outnumbered him); *Tekle v. United States*, 511 F.3d 839, 845 (9th Cir. 2007) (stating that this court has held that "the pointing of a gun at someone may constitute excessive force, even if it does not cause physical injury."); *Robinson v. Solano County*, 278 F.3d 1007, 1013-14 (9th Cir. 2002) (holding that the officers' use of a drawn gun at close range when they pointed the gun at head of unarmed misdemeanor suspect is actionable) (en banc).

[11] In addition, there are questions of fact regarding whether Officer Keesor's and Alvis's use of deadly force was reasonable. Both officers fired their entire magazines at Sullivan. Officer Keesor fired 12 shots at Sullivan. Officer Alvis fired 13 shots at Sullivan. All shots were fired at close range. The officers stated that Sullivan refused to show his hands and made disturbing statements, such as "Kill me or I'll kill you" and "Are you ready to shoot me?" Officer Alvis stated that she thought she saw something in Sullivan's hands and when he moved his right arm that she thought he was going

to shoot her. Officer Keesor stated that he saw something that looked like a gun in Sullivan's hand, heard a pop, and began shooting at Sullivan. According to the officers, Sullivan was resisting arrest and posed a high risk to their safety. Still, Sullivan had not been accused of any crime. He was not a threat to the public and could not escape. He had not initially caused this situation. He had not brandished a weapon, spoken of a weapon, or threatened to use a weapon. Sullivan, in fact, did not have a weapon. Viewing the evidence in the light most favorable to the plaintiffs, defendants have failed to show that there are no questions of fact regarding whether the use of deadly force was reasonable. *See id.*; *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003) (affirming denial of qualified immunity on excessive force claim where suspect posed no safety risk).

### III.   Provoking a Confrontation

**[12]** Finally, the district court properly denied defendants' summary judgment motion on whether the officers were entitled to qualified immunity for allegedly violating Sullivan's Fourth Amendment rights by intentionally or recklessly provoking a confrontation. Where a police officer "intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation, he may be held liable for his otherwise defensive use of deadly force." *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002). If an officer intentionally or recklessly violates a suspect's constitutional rights, then the violation may be a provocation creating a situation in which force was necessary and such force would have been legal but for the initial violation. *Id.*

**[13]** In this case, the district court did not err in finding that there are genuine issues of fact regarding whether the officers intentionally or recklessly provoked a confrontation with Sullivan. Evidence strongly suggests that the initial entry into the apartment by Officer Morgado violated Sullivan's

Fourth Amendment rights. Viewing the evidence in the light most favorable to the plaintiffs, there is evidence that the illegal entry created a situation which led to the shooting and required the officers to use force that might have otherwise been reasonable. *See Alexander v. City and County of San Francisco,* 29 F.3d 1355, 1366 (9th Cir. 1994) (holding officers provoked a confrontation where they entered a man's house without a warrant and this violation provoked the man to shoot at the officers). Because there is a genuine issue of fact regarding whether the defendants intentionally or recklessly provoked a violent confrontation, the district did not err in denying defendants' summary judgment motion on this issue. *See id.*

Based on the foregoing, the district court properly denied the summary judgment motion regarding qualified immunity because defendants failed to show as a matter of law that they did not violate Sullivan's Fourth Amendment rights.

All parties shall bear their own costs.

**AFFIRMED**.

---

WU, District Judge, concurring in part and dissenting in part:

I agree with the majority that the district court properly denied summary judgment as to the defendant officers' claim of qualified immunity in regards to their entering and searching the apartment. However, I disagree with the Opinion's resolution of the qualified immunity question in the contexts of the unreasonable force and provoking a confrontation issues.

## I.  FACTS/EVIDENCE[1]

[1]Northern District of California Civil Local Rule 56-1(a) states that "Unless required by the assigned Judge, no separate statement of undis-

Initially, further consideration of the facts/evidence is warranted.[2] On June 6, 2006 at approximately 8:28 p.m., a dispatch call went out over the San Francisco Emergency Communications Department ("ECD") system for an officer to conduct a premises check at 2 Garces Drive located in the Park Merced apartment complex.[3] San Francisco Police Department Officer Paulo Morgado responded at 8:33 p.m. After he had opened the door to the premises and saw the bloody T-shirt hanging on an interior door, between 8:40 and 8:43 p.m., he made requests over the ECD system for another police unit to assist in conducting a walk-through to check out the premises. In doing so, he specifically referenced "a T-shirt . . . hanging on the door with blood all over it."

Officers Michelle Alvis and John Keesor heard Morgado's transmission and responded at about 8:50 p.m. Additional police units also arrived thereafter. Morgado, Alvis, Keesor

_____

puted facts or joint statement of undisputed facts shall be submitted."

The record herein, does not contain any separate or joint statement of undisputed facts. Furthermore, aside from Defendants' Second Objection to and Motion to Strike Evidence Offered by Plaintiffs in Support of their Opposition to Motion for Summary Judgment (which mostly challenged the evidentiary basis for plaintiffs' expert's opinions), no evidentiary objections (or rulings thereon) have been provided.

The following factual summary has been made from a review of the entire record submitted on this appeal, noting any relevant factual disputes.

[2]As observed in *Blanford v. Sacramento County*, 406 F.3d 1110, 1115 (9th Cir. 2005), an analysis of an excessive force claim under the objective reasonableness standard of the Fourth Amendment requires "consideration of the *totality* of the facts and circumstances in the particular case [emphasis added]."

[3]The specified times cited herein are based upon the transcript of the audio dispatch recording of the communications over the ECD system that were made while the events herein were transpiring ("transcript"). The ECD system automatically records the times at which the calls are generated. A copy of that transcript was placed into the record, apparently without objection as to its accuracy.

and Officer Yukio Oshita entered the premises, announcing that they were San Francisco police officers. They did not encounter anyone on the first floor. Moving up to the second floor, there were a number of closed doors, one of which was to a bathroom. The door to the first bedroom was locked, but there were sounds of movement from within. The officers again announced that they were police officers and ordered the occupants to open the door. After a period of time, entry was obtained and the officers encountered Jason Martin. The officers ordered Martin to the ground. He complied and was handcuffed.

While dealing with Martin, the bedroom closet door was open and the officers heard movement above them. Believing that another person was trying to gain access to the roof, Morgado announced through the ECD system that "we got one going on the roof." Keesor went back downstairs and out of the building to determine if he could locate anyone on the roof. Eventually, personnel from the apartment complex informed Keesor that there was no roof-top exit from the attic, and he called in that information. Keesor then returned to the second floor of the premises and, with other officers, checked out a second bedroom. It was unoccupied. Although it had a closet, there was no access to the attic from that room. Upon Keesor's return to the first bedroom, Martin was searched for weapons and a four inch "ninja" knife was located in his back pocket. It did not appear to have any blood on it.

At about 8:56 p.m., Officer Erik Leung spoke with Keesor about setting up a perimeter. Morgado spoke with the dispatcher ("Dispatch") about getting a search dog unit. Around 9:02 p.m., Dispatch reported that it was "negative" as to the dog unit.

The officers elected to investigate the attic. Access to the attic was solely through an approximate 2-2½ foot hole at the top of the first bedroom's closet. To enter one had to utilize the closet's shelving to lift oneself up. Once inside, the attic

was extremely dark with no lighting. The attic was triangular-shaped but even at its center there was not enough room for the taller officers to stand. The floor of the attic was transversed at regular intervals by wood beams approximately six inches in height, in between which had been placed copious amounts of cotton-like white insulation material. Also interspaced at regular intervals were both vertical wood beams from floor to ceiling and outstretched diagonal rafters supporting the roof. There were also heating ducts and other obstructions present.

Alvis was the first officer up into the attic, followed by Keesor and Morgado. Because of a lack of space, Oshita remained half-way through the opening. They announced themselves as police officers. There was no verbal response. Using their flashlights and with guns drawn, the officers began searching the attic for any persons. Eventually, Alvis spotted Asa Sullivan, who was wearing a black T-shirt, jeans, heavy boots, and eyeglasses.[4] Sullivan was sitting/reclining in between two of the wooden beams and was partially covered by insulation. Alvis was the nearest officer to Sullivan, approximately 15 feet away. There were wood beams, rafters and other obstructions between the officers and Sullivan. Alvis ordered Sullivan to show the officers his hands, Sullivan did not comply and verbally indicated that he would not be taken into custody. Morgado announced through the ECD system, "Stand by, he's gonna be a 148, stand by." "148" is code for "resisting arrest."[5] At that point, all three officers (*i.e.*, Alvis, Keesor and Morgado) had their flashlights and guns trained on Sullivan.

Thereafter, the officers tried to get Sullivan to cooperate. He did not do so and continued to make statements indicating

---

[4]According to the Coroner's Report, Sullivan was 25 years old, five feet nine inches in height and weighed 208 pounds.

[5]Included in the transcript was a table as to the meaning of the code words utilized by the officers during the incident.

his intent to resist. Dispatch finally made contact with a dog unit that responded that it would be there in a few minutes. Alvis announced to Dispatch, "Be advised, this subject is refusing to show us his hands. I cannot see what is in his hands. Be advised." Morgado stated, "He's also said he's not coming into custody." Around that point, someone asked whether the officers could use "less than lethal." "Less than lethal" refers to a shotgun that has been fitted to shoot bean bags rather than pellets, and is usually not deadly unless fired at very close range. Morgado responded over the ECD system, "Hey Sarge, there's no way we can use less lethal. We're in the attic with rafters."

At about 9:06 p.m., it was reported that Sullivan had begun to pound the floor with his foot in an apparent attempt to make a hole through the floor into the bathroom below. Leung, who was in the bathroom, stated that "there doesn't appear to be any access." At some point, Martin began yelling to Sullivan from the bedroom to "just come on down, it's okay." Morgado asked the officers in the bedroom with Martin to inquire if he could tell them the name and date of birth of the person in the attic in order to check on his criminal status. Leung reported that Martin "doesn't know his name or his date of birth."

At around 9:07 p.m., Sullivan began getting more agitated and made statements of a threatening nature to the officers. Morgado reported via the EDC system that Sullivan was "trying to 801 by cop. Can't see his hands. He's claiming to have something." "801" is code for "person attempting suicide." During this period, Sullivan had continued to kick on the flooring and had managed to break open a small hole above the bathroom tub. Certain officers tried to use a pole with a hook to enlarge the hole in order to be able to pull Sullivan through it or to secure him. The ceiling material would not give way. At approximately 9:12 p.m., Officer Tracy McCray asked Morgado through the EDC system whether the less than lethal option could be used through the hole. Leung, who was

in the bathroom, responded that "we can't identify a target through a dark hole. So why don't we slow it down, see if we can get a hostage negotiator or something, because this guy's not listening to us."

Shortly thereafter, Alvis announced through the EDC system, "He's bringing his hand around, he's got something, hold on. **** The suspect's under the insulation, cannot see it, he's making movement." An officer on the ground reported that the canine unit had arrived. At about 9:15 p.m., McCray shouted over the EDC "shots fired, shots fired!"

The evidence as to what happened immediately before the shooting started varies somewhat among the four officers who were in the attic. Each officer was in a different location from the others.[6]

In the recorded interview of Alvis taken in the early morning of June 7, 2006 by inspectors from the San Francisco Police Department Investigations Unit, Alvis stated that she repeatedly asked Sullivan to show the officers his hands but he did not do so. He then began to move his right hand under the insulation and behind his back and then rapidly moved his right arm up. She heard a "pop" and saw what she thought was a "muzzle flash." Believing that she was being fired on, Alvis shot her own weapon. Alvis's February 22, 2008 deposition testimony and her June 16, 2008 declaration are consistent with her interview statements except that in her deposition and declaration she said that, when she saw Sullivan suddenly move his right arm, she "moved"/"fell backward," then heard the sound she believed was gunfire and saw the muzzle flash, and made the decision to fire her weapon. Also, in her deposition, Alvis stated that, just before the

---

[6]Alvis was standing and closest to Sullivan (about fifteen feet away). Morgado was a number of feet behind and to the left of Alvis. Keesor was even further away from Alvis but in a prone position on the attic floor. Oshita was still half-way through the opening into the attic.

shooting, Sullivan did bring up his left hand and was doing something with it, but she is certain he did not have a weapon in that hand.

Keesor in his June 7, 2006 interview stated that just prior to the shooting he had been talking to Sullivan trying to get him to cooperate. Sullivan — who had been responding verbally — stopped and gave Keesor "this weird look; and he takes a deep breath." Thereafter, he saw Sullivan appear to raise his hand(s)[7] holding a "black oblong thing" which looked to Keesor to be a barrel of a gun. He then heard a "pop" and Alvis fell from his peripheral field of vision. Believing that Sullivan had shot Alvis, Keesor opened fire. Keesor's February 12, 2008 deposition testimony and his June 18, 2008 declaration are generally consistent with his interview statements except that in his declaration it is unclear whether he fired his weapon upon seeing Sullivan raising his hand(s) with the dark object therein or if it was after also hearing what he though was gunfire. Keesor in his deposition stated that he did not see any muzzle flash coming from Sullivan's direction.

In his June 7, 2006 interview, Morgado stated that Sullivan had been repeating "tell my mom, tell my girlfriend I love them," followed by Alvis saying something that he couldn't understand, and then shots were fired. Upon hearing gunfire, Morgado was about to also fire his weapon but Keesor got in front of him and he elected not to shoot his gun. In his deposition, when asked when he first realized that "a gun had gone off in the attic," Morgado responded that it was when he "saw sudden movement of Mr. Sullivan . . . . I saw his right shoulder move in a forward direction over his waist to the left . . . ." In his June 16, 2008 declaration, Morgado stated that:

> While the Suspect was seated, after he made the statements that caused me to believe he may attempt

---

[7]Keesor was unsure if Sullivan raised only one hand or both hands.

to force us to shoot him, he made a sudden movement with the right side of his body that I thought was consistent with producing a firearm. Believing he was about to shoot at us, I began to depress the trigger on my weapon. Before I could fire, however, I realized that Officer Keesor may be in my way and I held fire. As a result, I did not discharge my weapon during this incident. Shortly after I saw the sudden movement of the right side of the Suspect's body I heard the sound of gunshots, some of which I believed were coming from the Suspect.

In his June 10, 2008 declaration, Oshita stated that before the shooting, Sullivan said: "hey, tell my mom that I love her, and tell my girl that I love her. You guys, I'm gonna make my move and you'll be sorry." Shortly thereafter, he heard gunshots and saw muzzle flashes.

No firearm or other weapon was found on or near Sullivan's body. A dark eyeglass case was located underneath his right forearm.

## II.   UNREASONABLE FORCE

### A.   *Applicable Law*

As noted in *Billington v. Smith*, 292 F.3d 1177 (9th Cir. 2002):

> In *Saucier v. Katz*, [533 U.S. 194 (2001),] the Supreme Court instructed lower courts deciding summary judgment motions based on qualified immunity to consider "this threshold question: Taken in light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" [*Id.* at 201.] If not, then "there is no necessity for further inquiries concerning qualified immunity." [*Id.*] If so, then "the

next, sequential step is to ask whether the right was clearly established." [*Id.*] A constitutional right is clearly established when, "on a favorable view of the other parties' submissions" "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." [*Id.*] In *Saucier*, the Supreme Court overruled Ninth Circuit precedent holding that "the inquiry as to whether officers are entitled to qualified immunity for the use of excessive force is the same as the inquiry on the merits of the excessive force claim." The Court rejected our view because an officer might be reasonably mistaken as to the facts justifying his actions, or as to the law governing his actions, so that an officer could use objectively excessive force without clearly violating the constitution.

\* \* \* \* \*

A police officer may reasonably use deadly force where he "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others. We analyze excessive force claims in the arrest context under the Fourth Amendment's reasonableness standard. We balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake" and ask whether, under the circumstances, "including the severity of the crime at issue, the suspect poses an immediate threat to the safety of the officers or others, or whether he is actively resisting arrest or attempting to evade arrest by flight." The reasonableness inquiry is objective, without regard to the officer's good or bad motivations or intentions.

*Id.* at 1183-84 (footnote and citations omitted). As further observed in *Graham v. Connor*, 490 U.S. 386 (1989):

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. **** The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation.

*Id.* at 396-97. Finally, *Tekle v. United States*, 511 F.3d 839, 844-45 (9th Cir. 2006), states that:

The legal framework is clearly established. The first factor in determining whether the force used was excessive is the severity of the force applied. *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003). The second factor, and the most important, is the need for the force. *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003). The amount of force used is "permissible only when a strong government interest *compels* the employment of such force." *Drummond*, 343 F.3d at 1057 (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001)). ****

Finally, we must balance the force used against the need, to determine whether the force used was "greater than is reasonable under the circumstances." *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002). This determination

"requires careful attention to the facts and circumstances of each particular case" and a "careful balancing" of an individual's liberty with the government's interest in the application of force. Because such balancing nearly always requires a jury to sift

> through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly. This is because police misconduct cases almost always turn on a jury's credibility determinations.

*Id.* at 853 (quoting *Graham*, 490 U.S. 396) (internal citations omitted).

## B. *Analysis*

### 1. *The Officers' Pointing their Guns at Sullivan*

There were two instances of force applied as to Sullivan which must be addressed and analyzed. First is the officers' act of training their firearms on Sullivan.[8] As stated in *Tekle*, 511 F.3d at 845, "[w]e have held that the pointing of a gun at someone may constitute excessive force, even if it does not cause physical injury. *See Robinson v. Solano County*, 278 F.3d 1007, 1014-15 (9th Cir. 2002) (en banc)." Second is the actual shooting of the firearms by Officers Alvis and Keesor.

Turning to the facts and circumstances confronting the officers, while encountering the bloody T-shirt would not by itself constitute probable cause to believe that a crime had been committed, it would certainly give rise to a reasonable belief that caution (because of possible danger to the officers) was appropriate.[9] Another factor was the officers' being

---

[8]Defendant Morgado is alleged to have used excessive force even though he did not fire his weapon at Sullivan or otherwise make physical contact with him. Hence, the only basis for an unreasonable force claim against Morgado would rest on his aiming his gun at Sullivan.

[9]As conceded in the Opinion, *supra* at page 3659, the presence of the bloody shirt in the interior of the apartment and the knife found on Martin "may have suggested some risk of harm."

denied immediate access to the first bedroom following their identifying themselves as police officers and requests for the door to be opened. Thereafter, the officers found Martin in the bedroom who cooperated with their commands. From the sounds of movement coming from the attic at that point, it was rational to conclude that there was another individual who was attempting to flee from the officers and who was in the attic or on the roof. Before climbing into the attic, a knife was found on Martin's person. Upon entering the attic, the officers found it to be extremely dark, illuminated only by the flashlights which they carried in one hand, and filled with rafters and other obstructions which hampered both movement and vision. When the person in the attic did not respond to their presence or announcements and remained hidden, in light of all of the referenced factors, it was objectively reasonable for the officers to have drawn their guns because of the possibility of danger to the officers in that situation.[10]

Thereafter, the officers located Sullivan who was in a position in between sitting and lying down on his back between two wooden beams on the floor, and partly covered by the insulation material. Despite the officers' repeated demands for him to show them his hands, he never raised his right hand which was underneath the insulation and, periodically, he would move his left hand in and out of the insulation material. Consequently, at no time during the entire incident could the officers have determined whether or not Sullivan was armed with a gun, knife or other weapon. Sullivan was a 25 year old

---

[10]In *Motley v. Parks*, 432 F.3d 1072, 1089 (9th Cir. 2005) (en banc), in the context of conducting a warrantless search of a parolee's purported residence not based on probable cause but solely upon a mandatory condition of parole, this court held that "While it may have been reasonable for [the police officer] to have drawn his firearm during the initial sweep of a known gang member's house, his keeping the weapon trained on the infant, as he was alleged to have done, falls outside the Fourth Amendment's objective reasonableness standard." "[A] police officer may well act reasonably in drawing his gun while he approaches a [person] in an uncertain situation." *In re Joseph R.*, 65 Cal. App. 4th 954, 961 (1998).

able-bodied, five foot nine inch, 208 pound man. Thus, pointing their weapons at him cannot be found to have been objectively unreasonable. The facts of this case are clearly distinguishable from Ninth Circuit precedent finding excessive force from the mere act of aiming weapons at an individual.[11] Here, Sullivan was not cooperative, was indicating that he would not be taken into custody, and was possibly armed with a weapon, plus all of the participants were in a dark, confined and obstructed location. In light of the above facts, the defendant officers are entitled to qualified immunity as to this portion of plaintiffs' unreasonable force claim.

### 2.   *Officers Alvis and Keesor's Shooting of Sullivan*

The problem with the district court's analysis of the unreasonable force issue in regards to Sullivan's shooting is that the court focused solely on the "provoking a confrontation" aspect without any consideration as to whether the undisputed facts/evidence show that the officers' firing of their weapons was objectively reasonable at the point in time of the shooting. As discussed below, the district court's conclusions as to the provoking a confrontation issue are incorrect. Hence, this portion of the case should be reversed and remanded for the

---

[11]For example, in *Tekle*, "twenty-three armed officers saw a barefoot [and unarmed] eleven-year old boy, clad in shorts and a T-shirt" emerge from a garage and, even after he cooperated with the officers' instructions, certain agents "held a gun to his head, searched him handcuffed him, pulled him up from behind by the chain of the handcuffs, and sat him on the sidewalk, still handcuffed, with their guns pointed at him, for ten to fifteen minutes." 511 F.3d at 845-46.

In *Robinson*, 278 F.3d at 1015, this court en banc, while finding that the law "was not sufficiently established in this circuit in 1995 to override the officers' claim of qualified immunity," held that "[t]he development of the law with respect to arrests and detentions now allows us to recognize as a general principle that pointing a gun *to the head* of an apparently, unarmed suspect during an investigation can be a violation of the Fourth Amendment, especially where the individual poses no particular danger. [Emphasis added]."

district court to decide whether the undisputed facts establish that Officers Alvis and Keesor's firing of their weapons was objectively reasonable.

On the issue of the shooting, all of the previously discussed facts/evidence would come into play. Furthermore, the officers continually made requests throughout the incident for Sullivan to show both his hands, but he never did so. Additionally, he made statements which: 1) indicated his intent not to be taken into custody; 2) were of a threatening nature in regards to the officers' safety; and 3) led the officers to believe that he was contemplating "suicide by cop."[12] In addition, once the officers encountered Sullivan in the attic, they did not act precipitously. They did not rush and attempt to subdue him. As the time elapsed, they considered options such as using less than lethal weapons and trying to force a larger hole through the bathroom ceiling/attic flooring to gain access to Sullivan's person. Also, they had made a request for a canine unit and were waiting for it to arrive.

Finally, and most importantly, one must consider what was happening just before the officers' use of the force.[13] Here, there was testimony that immediately preceding the shooting, there were: 1) Sullivan's sudden movement of his right hand behind his back, 2) Sullivan's sudden lifting of his right arm, 3) Sullivan's raising something in one or both of his hands, 4) the sound of a "pop" that, to certain of the officers, was like a gunshot, and 5) a muzzle flash as if from a gun. Officer Alvis stated that she believed that Sullivan was shooting a gun at her so she returned fire. Officer Keesor testified that he thought that Sullivan had shot Alvis after he heard the pop

---

[12]As to the validity of the "suicide by cop" concept, *see generally Boyd v. City and County of San Francisco*, 576 F.3d 938, 945-46 (9th Cir. 2009).

[13]It does not appear that the district court specifically considered the facts and circumstances confronting the officers at this critical period of time.

and she fell from his peripheral view. He then opened fire. Although it is not disputed that Sullivan had no firearm to shoot, the question not addressed by the district court is whether Alvis and Keesor had objectively reasonable beliefs that Sullivan had a gun and was using it at the time they fired their weapons.[14]

## III.  PROVOKING A CONFRONTATION

### A.  *Applicable Law*

*Alexander v. City and County of San Francisco*, 29 F.3d 1355 (9th Cir. 1994), involved a case where San Francisco police officers, pursuant to merely an administrative inspection warrant, decided to storm into the home of a man known to be "a mentally ill, elderly, half-blind recluse who threatened to shoot anybody who entered [his house]." *Id.* at 1366. He was shot and killed when he pointed and tried to fire a handgun at the entering officers. This court held that, if the officers committed an independent Fourth Amendment violation by using unreasonable force to enter the decedent's

---

[14]The majority Opinion seems to imply that there are factual questions in regards to the use of deadly force because Officers Keesor and Alvis emptied their entire magazines when firing at Sullivan and because, in the majority's view, Sullivan "had not initially caused this situation." A question arises as to why the majority feels that, under the facts herein, it makes any difference whether the officers fired one bullet or "12 shots." If there was a reasonable basis to believe that deadly force was appropriate in the situation, given the darkness of the location, the rafters and other obstructions, and additional factors which impeded the officers' determination as to the accuracy of their shots, there is no basis to believe that it would have been rational for the officers to count the number of bullets fired and to stop at some arbitrary figure.

Additionally, to claim that Sullivan "had not initially cause this situation" is highly questionable. Had Sullivan remained in the first bedroom when the officers announced their presence, had he shown both of his hands when repeatedly requested to do so by the officers, and had he not made the statements to the officers which were of a threatening and uncooperative nature, then the "situation" would have been entirely different.

house, then they could be held liable for shooting him — even though it was objectively reasonable to use their guns at the moment of the shooting — because they "used excessive force in creating the situation which caused [the decedent] to take the actions he did." *Id.* The district court's analysis of the excessive force issue, although citing to the *Billington* decision, actually rests on the initial concepts delineated in *Alexander*.[15]

However, as noted in *Billington*, 292 F.3d at 1188-90:

> We have since placed important limitations on *Alexander*. In *Scott v. Henrich* [,39 F.3d 912 (9th Cir. 1994)], we held that even though the officers might have had "less intrusive alternatives available to them," and perhaps under departmental guidelines should have "developed a tactical plan" instead of attempting an immediate seizure, police officers "need not avail themselves of the least intrusive means of responding" and need only act "within that range of conduct we identify as reasonable." [*Id.* at 1169.] We reinforced this point in *Reynolds v. County of San Diego*, [39 F.3d 912 (9th Cir. 1994),]

---

[15]As specifically stated in the district court's Order re Parties' Cross-Motions for Summary Judgment:

The Court's determination that it cannot find as a matter of law that Officers Alvis and Keesor's warrantless entry and search did not violate the Fourth Amendment also precludes granting summary adjudication as to whether the officers' use of deadly force was reasonable. "[W]here an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation, he may be held liable for his otherwise defensive use of deadly force." *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002). In addition to the questions of fact regarding whether Officers Keesor and Alvis' entry and search was an independent violation of Sullivan's Fourth Amendment rights, the Court finds there are questions of fact as to whether the officers' entry and search provoked the officers' use of deadly force.

which distinguished *Alexander* because "the court must allow for the fact that officers are forced to make split second decisions." [*Id.* at 915.] We affirmed summary judgment for the defendant police officers despite experts' reports stating — like the expert report in the case at bar — that the officers should have called and waited for backup, rather than taking immediate action that led to deadly combat. We held that, even for summary judgment purposes, "the fact that an expert disagrees with the officer's action does not render the officer's action unreasonable." [*Id.* at 1170.] Together, *Scott* and *Reynolds* prevent a plaintiff from avoiding summary judgment by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless. Rather, the court must decide as a matter of law "whether a reasonable officer could have believed that his conduct was justified." *Id.*

We placed an additional limitation on *Alexander* in *Duran v. City of Maywood* [, 221 F.3d 1127 (9th Cir. 2000)]. In *Duran*, police officers responding to a report of shots fired in a residential neighborhood walked up the plaintiffs' driveway toward their garage silently, without identifying themselves, and holding their guns. Then they heard someone cocking a pistol and saw an armed man in the garage. They shot him after he ignored their orders to drop his gun and pointed his gun at them. The plaintiffs appealed the jury's defense verdict because the district court did not instruct the jury, under *Alexander*, that the officers could violate the Fourth Amendment by provoking the use of deadly force. We affirmed, holding that an *Alexander* instruction is unnecessary where there is no "evidence to show that the officer's actions were excessive and unreasonable" and caused the "escalation that led to the shooting," and

where the evidence does not show that the officer's actions "should have *provoked* an armed response." [*Id.* at 1131.]

We read *Alexander*, as limited by *Duran*, to hold that where an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation, he may be held liable for his otherwise defensive use of deadly force. In *Alexander*, the officers allegedly used excessive force because they committed an independent Fourth Amendment violation by entering the man's house to arrest him without an arrest warrant, for a relatively trivial and non-violent offense, and this violation provoked the man to shoot at the officers. Thus, even though the officers reasonably fired back in self-defense, they could still be held liable for using excessive force because their reckless and unconstitutional provocation created the need to use force.

*Alexander's* requirement that the provocation be either intentional or reckless must be kept within the Fourth Amendment's objective reasonableness standard. The basis of liability for the subsequent use of force is the initial constitutional violation, which must be established under the Fourth Amendment's reasonable-ness standard. Thus, if a police officer's conduct provokes a violent response, as in *Duran*, but is objectively reasonable under the Fourth Amendment, the officer cannot be held liable for the consequences of that provocation regardless of the officer's subjective intent or motive. But if an officer's provocative actions are objectively unreasonable under the Fourth Amendment, as in *Alexander*, liability is established, and the question becomes the scope of liability, or what harms the constitutional violation proximately caused. [Footnotes omitted.]

B.   *Analysis*

Even accepting the proposition that Officers Alvis, Keesor and Morgado's presence in the attic was not constitutionally proper,[16] they cannot be found to have provoked a confrontation under the *Alexander/Billington* line of cases. First of all, unlike the facts in *Alexander*, the officers here had no advance knowledge that, when they got into the attic, they would meet an individual who was definitely armed and/or mentally unstable. Also, the officers' actions were not excessive and/or unreasonable in light of the developing events that transpired in the attic. Furthermore, the evidence does not demonstrate that the officers' conduct either caused an escalation that led to the shooting or should have provoked an armed or violent response. *See Billington*, 292 F.3d at 1189. Indeed, had Sullivan cooperated with the officers' commands as did Martin, there is no doubt that he would have been treated in the same manner and survived the encounter.

One last point should be made: it is not disputed that the only entrance to (or exit from) the attic known to the officers was through the hole in the closet ceiling. As they indicated in their statements/testimony which is uncontradicted by the

---

[16]The fact that the officers may have been negligent when they decided to climb up into the attic will not give rise to liability for the use of reasonable force thereafter. As stated in *Billington*,

> Under *Alexander*, the fact that an officer negligently gets himself into a dangerous situation will not make it unreasonable for him to use force to defend himself. The Fourth Amendment's "reasonableness" standard is not the same as the standard of "reasonable care" under tort law, and negligent acts do not incur constitutional liability. An officer may fail to exercise "reasonable care" as a matter of tort law yet still be a constitutionally "reasonable" officer. Thus, even if an officer negligently provokes a violent response, that negligent act will not transform an otherwise reasonable subsequent use of force into a Fourth Amendment violation.

292 F.3d at 1190 (footnote omitted).

evidence in the record, once they encountered Sullivan in the attic, the officers reasonably believed they could not safely retreat and exit the attic without first determining whether or not he had a gun, knife or other weapon. To climb down through the hole, one had to use both hands/arms to lower oneself, which would render the officer defenseless to an attack. Thus, until such time as the officers could make a determination as to whether Sullivan had a weapon, they could not safely retreat or leave the attic.

## IV.   CONCLUSION

For the reasons stated, I dissent from the majority's affirmation of the district court's denial of the defendant officers' motion for summary judgment on the basis of qualified immunity as to the issues of excessive force and provoking a confrontation.